[No. A117787. First Dist., Div. Five. Jan. 13, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LEE HILL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. through VIII.

COUNSEL

Kathy Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, René A. Chacón and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIMONS, J.—While patrolling San Francisco's Bayview District in an undercover capacity, Police Officer Isaac Espinoza was shot and killed and

his partner, Officer Barry Parker, was wounded by David Lee Hill (appellant). Appellant's trial focused primarily on his motivation for shooting the officers. The jury rejected the defense theory that appellant did not realize the victims were police officers and shot them in self-defense. Appellant was convicted of second degree murder with a peace officer special circumstance and firearm enhancements (Pen. Code, §§ 187, 190, subd. (c), 12022.53, subd. (d), 12022.5, subd. (b))[1] (count 1), attempted first degree murder (§§ 664, 187) (count 2), assault on a peace officer with personal use of an assault weapon (§§ 245, subd. (d)(3), 12022.5, subd. (b)) (count 3), and possession of an assault weapon with a gang allegation (§§ 12280, subd. (b), 186.22, subd. (b)(1)) (count 4).[2] He was sentenced to life in prison without the possibility of parole on count 1, plus a consecutive term of life with the possibility of parole on count 2. The court stayed the weapon enhancements on count 1, and imposed a 15-year sentence on count 3 and a two-year sentence on count 5. The court imposed a consecutive two-year term plus a three-year enhancement on count 4, to be served first. (§ 669.)

Appellant raises claims of evidentiary and sentencing error and prosecutorial misconduct, and contends his motion for new trial was erroneously denied. In the published portion of this opinion, we rule on appellant's numerous challenges to the testimony of the prosecution's gang expert, San Francisco Police Inspector Tony Chaplin. Among other issues, we address the trial court's determination that Chaplin could testify on direct examination about the out-of-court statements he relied on in forming certain of his opinions. The trial court ruled that such statements did not come in for their truth, but only to assist the jury in evaluating Chaplin's opinions. Though we disagree with this ruling, we conclude it rests on relevant Supreme Court precedent, which binds us. We conclude that no reversible error was committed by the trial court and affirm.

## BACKGROUND

### *The Prosecution's Case*

Around 9:00 p.m. on April 10, 2004, Parker and Espinoza patrolled the Bayview District (the Bayview) in an unmarked gray Crown Victoria patrol car, dressed in civilian clothes. Parker drove and Espinoza sat in the front passenger seat. As Parker turned from Third Street onto Newcomb Avenue (Newcomb), he heard someone say, "woo woo," usually a signal to people on the street that police are present. Parker continued driving down Newcomb

---

[1] All further undesignated section references are to the Penal Code.

[2] On October 12, 2006, in the middle of trial, appellant pled guilty to participation in a criminal street gang (§ 186.22, subd. (a)) (count 5).

toward Newhall Street (Newhall) and observed two men walking toward the corner of Newcomb and Newhall. As Parker drove closer, the two men appeared startled, stopped walking and looked in the officers' direction. One of the men, appellant, then turned right and walked southbound on Newhall, looking over his shoulder at the officers. Appellant wore a dark, three-quarter-length peacoat. The other man continued walking straight ahead.

As the officers turned onto Newhall from Newcomb and drove "at a crawl," appellant stopped, backed up against a van and appeared to shrug his shoulders or take a deep breath. Seconds later, appellant continued walking on Newhall. The officers followed appellant until they were parallel with and approximately 16 feet from his position on .the sidewalk. From inside the patrol car, Espinoza shined his flashlight on appellant's face; appellant immediately turned and looked directly toward the patrol car. Appellant then turned away and continued walking on the sidewalk down Newhall. Appellant's left arm swung in a natural walking motion, but not his right arm. Parker told Espinoza appellant was trying to conceal something from them and suggested the officers stop and talk to him.

Parker and Espinoza exited the patrol car. Parker's police star was outside his shirt. Parker stood between the open driver's door and the driver's seat while Espinoza approached appellant, who was walking on the sidewalk. Espinoza again flashed his flashlight on appellant and said, "Hey, let me talk to you." Appellant was about 10 to 12 feet in front of Espinoza. Appellant twice said, "I don't have any I.D." and looked over his shoulder at Espinoza. Espinoza did not take his gun out. Appellant started walking fast, and Espinoza twice said to him, "Stop, police."

Parker then entered the patrol car and drove about 10 feet farther up the street. Appellant continued walking, with Espinoza following him on foot at a distance of five to seven feet. Appellant stopped and turned to face Espinoza. Parker saw the magazine of an assault rifle, and appellant fired two shots. Espinoza fell to the ground.

Parker exited the patrol car, knelt down between the front driver's door and driver's seat and took out his gun. Parker heard more shots fired in his direction; the patrol car's windshield exploded. Parker moved behind the trunk of the patrol car as he continued to receive gunfire. He then ran across the street seeking "good cover" on the sidewalk on the east side of Newhall. Parker never had a chance to fire a shot. At some point the shooting stopped and Parker radioed an "officer down" message.

The "upset, scared" Parker went to Espinoza, who was lying on the sidewalk with his fully loaded gun inside its fastened holster. Espinoza was

transported to the hospital, where he died from loss of blood from gunshot wounds to his thigh and abdomen. Parker was treated at the hospital for bullet fragments in his ankle. At 1:00 a.m., about three hours after the shooting, while at the emergency room, Parker was shown a photo lineup and identified a picture of Reuben Sibley as Espinoza's killer. Parker signed and wrote his star number on Sibley's photo.[3]

Police recovered 12 shell casings at the shooting scene on Newhall between the unmarked patrol car and the street. An AK-style semiautomatic assault rifle with an attached magazine was found nearby at 1790 Oakdale Avenue. Eleven of the 12 shell casings were later determined to have been fired from this weapon.[4] Each bullet fired required a separate trigger pull. A crime scene investigator opined that, based on the trajectory of the shots fired, some shots were fired from the sidewalk, while others were fired after the shooter moved from the sidewalk into the street.

At 1835 Palou Avenue, police found a peacoat and gloves which residents had seen someone discard. Appellant's California identification card and a small plastic bag containing suspected marijuana were found inside the peacoat.

Between 11:00 and 11:45 p.m. on the night of the shooting, appellant went to the San Francisco home of his grandmother, Annie Lee Clark, and told her he thought he had shot someone. Appellant seemed "nervous and upset."

The next morning, at 11:30 a.m., uniformed San Ramon police officers were dispatched to the San Ramon Regional Medical Center (medical center) in response to a report that a large male in the emergency room was acting "very strange" and paranoid and the staff feared he might become violent. En route, police learned there was a murder suspect in the emergency room. The police arrived with guns drawn and found appellant holding two plastic flowers. Appellant complied with police orders to lie prone on the floor and was handcuffed. Thereafter, he began loudly making repeated comments about being a slave, such as: "Mary Lou made me do it," "Master Charley, don't beat me," and "I pick over 100 pounds of cotton a day." At one point he stood up and yelled, "Guards," three or four times. He moved to within six inches of the glass window in the door and loudly said, "I'm Julius Caesar. I need to go back to Rome." He then twice violently slammed his forehead into the door window.

---

[3] According to San Francisco Police Homicide Inspector Holly Pera, when Parker was shown the photo lineup he made no identification.

[4] The 12th casing had been "cycled through" the assault rifle, but was not necessarily fired from it.

Out of concern for appellant's safety, he was placed in ankle restraints while on the floor. He was moaning, groaning, grunting and yelling unintelligibly. He then urinated on himself and rolled onto his back so that his hands were wiping the urine. When Pera and her partner (Inspector Toomey) arrived, appellant was continuously saying "master, master, don't hurt me, master." When appellant saw an officer holding a gunshot residue kit he began kicking and screaming and was physically restrained during the performance of the gunshot residue test.

After the medical center cleared appellant for release, he was transported by ambulance to the San Francisco Jail. A blood test conducted on him at approximately 4:00 p.m. on April 11, 2004, reflected the inactive metabolite of marijuana. The blood test results indicated that there was no active psychoactive compound present in appellant's blood, but that at some point he had consumed marijuana, possibly at 4:00 a.m. or 6:00 a.m.[5]

### Gang Expert Testimony

Chaplin testified as an expert on gang members, specifically those from African-American gangs in the Bayview/Hunters Point area of San Francisco. Chaplin said West Mob is a criminal street gang that has continuously existed since before 2000. He identified West Mob's geographic "territory," an area between West Point and Middle Point. West Mob members commit rape, homicide, assault with firearms, narcotic sales, car theft, burglary, and robbery. These crimes enhance the gang's reputation and benefit it monetarily. West Mob operates with "situational leadership" and its members, who are predominantly African-American, share guns, cars and the proceeds of their crimes. Between 2000 and mid-2004, West Mob had gang alliances with Oakdale Mob and Sunnydale.

Chaplin stated that Big Block is a criminal street gang in the Bayview that has existed continuously since before 2000. He described its geographic "turf" as Northridge Road between Harbor Road and Jerrold Avenue on one side and Kiska Road on the "back," including Milton Meyer Recreation Center. Between 2000 and mid-2004 Big Block had gang alliances with BNT ("Broke Niggas Thievin")/Kirkwood Mob and Get Paid. Chaplin said Big Block's leader, Douglas Stepney, admitted a rivalry existed between Big Block and West Mob that began at the end of 1999 and existed actively in April 2004. Gang members cannot move freely throughout the Bayview; if they leave their respective areas, they "fear" being shot or killed. In April 2004, Big Block and West Mob members could not safely sell drugs on each

---

[5] On cross-examination, the forensic expert conceded it was possible that the blood test result was consistent with appellant's having smoked marijuana on the night of the shooting.

other's turf. As a result of this rivalry, between 2000 and the first half of 2004, there were hundreds of shootings in the area. Chaplin testified that retaliation is a part of gang culture; it instills a sense of pride in the gang. When asked about how gang killings are done, Chaplin said, "Some of them are crime[s] of opportunit[y], some of them are orchestrated events, some of them are orchestrated to get one individual and you end up getting another one. [¶] . . . [¶] . . . So if the guy you're looking for is not there, . . . you're not just going to turn around and run out. You're going to do what you have to do at that point."

Chaplin said that gang members harbor hostile attitudes toward the police. "Retaliation against a [rival] gang member sends a message to other gang members, but the murder of a police officer sends a message to the community, 'Hey, even your protectors can be touched.' "

Chaplin testified that, in April 2004, a West Mob member could safely purchase marijuana anywhere in the Bayview except for Newcomb and Newhall. Newcomb and Newhall was an area one "would not ever expect to see somebody from West Mob . . . for any reason other than a gang reason, a shooting or a killing."

Chaplin explained the 11 criteria formulated by the San Francisco District Attorney's Office and the San Francisco Police Department to determine whether a person is a member of a Bayview African-American gang. Chaplin said a person must meet two or more of those criteria to be listed as a gang member. Based on specific incidents occurring between March 1998 and December 2003, Chaplin opined that appellant was an active participant in West Mob for at least five years prior to April 2004.

Chaplin said that gang members refer to an unmarked police car as a "ghost," such as "white ghost" or "gray ghost." An audiotape of a conversation between appellant and Deangelo Redd at the San Francisco Jail on June 20, 2004, was played for the jury. Chaplin said that appellant's reference in the tape to "white ghost" means an unmarked police car.

Chaplin said Ronnie "Uda" Allen, deceased at the time of trial, was a central figure in the Big Block gang from 2003 through April 2004. Chaplin frequently saw him in Big Block's home turf and BNT's home turf and the "1700 block area" of the Bayview, described as Newcomb and Newhall. On May 3, 2004, Chaplin talked to Allen outside Allen's home at 1662 Newcomb. Chaplin asked Allen why West Mob was "out to get him," and Allen responded, "Because of some shit they think I did. [¶] . . . [¶] That shit that happened to Espinoza was meant for me." Chaplin said that Allen's "extremely active" role in Big Block up to April 2004 made him a target for West Mob retaliation.

Chaplin testified appellant knew Allen because Allen's gang name, Uda, came up in a recorded jailhouse conversation between appellant and another jail inmate on May 30, 2004. Chaplin opined that appellant's actions on the night of the April 10 shooting were consistent with a West Mob member retaliating against a Big Block member based on the following hypothetical facts: (1) appellant's brother, James Hill, was shot in the Bayview in April 2000; (2) West Mob member Deandre Dow was murdered in a driveby shooting at West Point and Middle Point in February 2004; (3) Allen murdered Dow; (4) Allen was a member of Big Block; (5) Allen was staying at 1662 Newcomb in April 2004; (6) appellant had been a West Mob member for four or five years before April 2004; (7) at approximately 9:30 p.m. on April 10, 2004, appellant was walking with another African-American male on the 1700 block of Newcomb and appellant had a loaded assault rifle hidden under his peacoat; and (8) appellant walked to about 200 feet from 1662 Newcomb. Armed with a loaded assault rifle, appellant "was walking up to . . . arguably the most dangerous of all rivals of his group."

*The Defense*

On the evening of April 10, 2004, Louis Telfor testified he was on Newcomb and Newhall selling drugs when he saw appellant talking to Telfor's friend, "Niles." Niles told Telfor he was going to sell appellant some marijuana. On numerous prior occasions, Telfor had seen appellant purchase marijuana at Newhall and Newcomb. As Telfor headed for home, he saw a police Crown Victoria and Espinoza said to him, "Hey Louie." Telfor wanted to avoid the police so he began walking toward McKinnon Avenue to his mother's house. Five or seven minutes later he heard gunfire.[6] Telfor said the unmarked Crown Victorias he sees in the Bayview are either undercover police cars or are driven by people he does not know. According to Telfor, in 2004 it was safer to buy drugs on Newcomb than on Third Street.

Freelance writer Charles Jones lived in the Bayview for most of his life, until late 2003 or early 2004. He opined that at 9:30 p.m. in April 2004 it would be safer for anyone from the Bayview, including a gang member, to walk on Newhall and Newcomb than to walk on Third Street because Newhall and Newcomb is less populated and darker. Similarly, during that time period it would also be safer to buy marijuana on Newhall than at Third and Newcomb.

Neurophysiologist Scott Fraser testified on the effects of high stress on human functioning, particularly perception and memory. He opined that a

---

[6] On cross-examination, Telfor stated he could have told police on April 15, 2004, that he saw appellant running away after the shooting, but testified at trial he did not see appellant running away.

hypothetical police officer's statement, taken 48 hours after an extremely traumatic event, that his police star was underneath his shirt (or he could not remember the star's location) was more reliable than the same officer's trial testimony two and a half years later that his star was outside his shirt. Fraser also opined that waiting 48 hours to interview a police officer whose partner died in a shooting results in the officer's memory being less accurate than it would have been had he been interviewed much closer to the time of the shooting.

Fraser also testified that a person under the influence of marijuana will have "less acuity in terms of processing information, . . . discerning intentions, assessing consequences . . . ." He said that under the influence of marijuana a person tends to get distracted, has a short attention span, does not process information as carefully, and takes longer to make decisions. He opined that hypothetically, when a person is under the influence of marijuana and is in a high stress situation where he or she feels his or her life is threatened, the person is more prone to "automatic fight or flight responses. If [the person has] the resources to fight, the research indicates the person would probably engage in counterattack. If [the person] would have the . . . capability for flight but not the resources to attack, [the person will] try to run . . . try to escape." Fraser said this would include police officers and gang members.

William Gaut testified as an expert in police administration, practices and procedures. He opined that the firearm used in this case could easily fire 11 shots in under five seconds by a rapid pulling of the trigger. Gaut also opined that gray Crown Victorias used for undercover work blend more easily into the pavement so that people are not as likely to notice them and, at night, such a car is less recognizable as a Crown Victoria.

Criminalist Peter Barnett performed a bullet trajectory analysis and opined that the person who fired the shots at the subject Crown Victoria could have been standing on the sidewalk when he did so.

### Closing Arguments

The prosecution argued that appellant, a West Mob member, armed himself with the assault rifle with the intent to kill rival Big Block member Allen, who appellant believed was responsible for killing West Mob member Dow. Appellant recognized that Espinoza and Parker were police officers and opened fire on them because he did not want to be taken into custody for possession of the assault rifle.

The defense argued that appellant went to Newcomb and Newhall intending to purchase marijuana and was armed with the assault rifle for his safety.

Appellant did not know that Espinoza and Parker were police officers and shot at them in self-defense.

## DISCUSSION

### I. *Testimony by the Gang Expert*

Appellant raises numerous challenges to the gang expert's testimony. Appellant argues Chaplin lacked the qualifications to provide certain of the opinions admitted, certain opinions were based on unreliable sources, and Chaplin improperly testified to inadmissible matter he relied upon in forming his opinions.

### A. *Pretrial Procedural Background*

Pretrial, the prosecution argued for admission of evidence of the Dow murder as relevant motive evidence and evidence a gang expert could rely on when discussing retaliatory motives. Appellant objected on numerous grounds, noting the absence of any evidence that appellant knew or believed that Allen was responsible for Dow's murder. The court granted the motion to admit this evidence.

The prosecution also sought to admit evidence of the federal plea agreements of Big Block members Douglas Stepney and Kim Ellis and of a gang member named Acie Mathews; appellant objected that the confrontation clause as interpreted in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*) barred this evidence. The prosecutor argued Chaplin was relying on admissions made in the plea agreements, and those statements were admissible as a basis for his expert opinion. In addition, he argued the plea agreements and the statements therein were themselves admissible evidence. The court ruled that if it permitted Chaplin to testify as an expert, he could rely on the statements made in the plea agreements as a basis for one or more of his opinions, but took under submission whether *Crawford* prohibited the introduction of the statements in the plea agreements.

The trial court also ruled that Chaplin's gang expert testimony did not need to be qualified under *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*). Further, the court did not find any item of information relied upon by Chaplin in forming his opinions to be unreliable. The court stated appellant could "attack on cross-examination" any basis for Chaplin's

opinions, and any lack of reliability went "to the weight of the evidence and not to the admissibility of the evidence." In reliance on *People v. Thomas* (2005) 130 Cal.App.4th 1202 [30 Cal.Rptr.3d 582] (*Thomas*), the court rejected appellant's contention that the confrontation clause barred Chaplin from testifying about hearsay statements underlying his opinions because the statements would not be offered for their truth. The court also rejected appellant's argument that *Crawford* applied to bar the introduction into evidence of the Stepney/Ellis/Mathews federal plea agreements that contained statements Chaplin was relying on in forming opinions, and issued a "tentative ruling" permitting admission of the plea agreements into evidence. The court granted appellant's motion for a "standing" *Crawford* objection to the gang expert testimony. On the issue of whether Chaplin qualified as a gang expert, the trial court stated that it would base its ruling on the evidence elicited at the preliminary hearing and Chaplin's supplemental in limine testimony.

Subsequently, the court found Chaplin qualified to testify "as an expert as to gang matters, specifically African-American gangs in the Bayview/Hunters Point area of San Francisco." The court ruled that Chaplin could testify to "gang activity in general," and the "expectations of gang members in general, when confronted with a specific action." However, the court ruled that Chaplin could not testify to appellant's "subjective intent" at the time of the charged crime. It also ruled that "there has been a sufficient showing here that [Chaplin] could talk about the retaliation and gang motivation." Appellant objected, pursuant to Evidence Code section 352, arguing the thrust of Chaplin's testimony was "funneling things he's heard from other people," but the court rejected this argument. Over appellant's objection, the court ruled the prosecution could introduce evidence of 14 separate shootings, including 13 murders and five gunshot injuries, which occurred in the Bayview between early 2000 and February 2004.

After commencement of the jury trial, appellant again protested the introduction of hearsay evidence and Chaplin's reliance on it. Appellant argued that *Thomas* was wrongly decided, the out-of-court statements Chaplin related were introduced for their truth, and much of the proffered hearsay from unnamed people underlying Chaplin's opinion was unreliable. In rejecting appellant's arguments, the court stated that *Thomas* was controlling authority and the statements at issue were not being introduced as direct evidence against appellant, but only to help the jury evaluate Chaplin's opinions. At the end of the case the court provided a limiting instruction regarding portions of Chaplin's testimony: "Chaplin testified that in reaching his conclusions as an expert witness he considered statements made by

various individuals. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

B. *Chaplin's Qualifications as a Gang Expert*

Appellant contends the trial court erred in qualifying Chaplin as a gang expert on "anything beyond the existence and general culture of San Francisco Bayview gangs."

A person is qualified to testify as an expert if the person has "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) The determination that a witness qualifies as an expert and the decision to admit expert testimony are within the discretion of the trial court and will not be disturbed without a showing of manifest abuse. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177 [99 Cal.Rptr.2d 485, 6 P.3d 150].) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " '*clearly lacks* qualification as an expert.' " ' [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 162 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

At the September 2005 preliminary hearing, Chaplin testified he had been a police officer for about 15 years and had been assigned to the San Francisco Police Department's gang task force for approximately six years. As a gang task force inspector, he patrolled gang neighborhoods, made contact with gang members whenever possible, and investigated hundreds of gang crimes including shootings, attempted murders, assaults, and narcotics sales. Approximately 90 percent of Chaplin's time was dedicated to investigating Bayview gang crime. Since 2000, Chaplin had attended numerous classes regarding gang culture, the investigation of gang crime, and the identification of gang members. In 2004, he taught classes on African-American gangs in San Francisco, including in the Bayview. On numerous occasions Chaplin taught new San Francisco police recruits, school resource officers, and probation and parole officers about gangs, gang culture and investigating gang crimes. Chaplin is a member of the California Gang Investigators Association, which disseminates information throughout the state about current trends and actions by gang members. Chaplin received on-the-job training from other police officers regarding Bayview street gangs, including information about investigating gang crime in the Bayview. Chaplin also routinely talked to officers at the Bayview police station about current trends, "things that are going on" with African-American gangs and graffiti the

officers had seen. In the past six years Chaplin had become familiar with Bayview gang-related graffiti and tattoos, and had spoken with members of West Mob and Big Block.

At the July 2006 Evidence Code section 402 hearing, Chaplin testified he continued to work as a gang task force inspector and at least 90 percent of his work was dedicated to investigating Bayview African-American street gangs. He went to the Bayview almost every day he worked, visiting the police station and talking with the officers about what was going on in the neighborhoods. He also talked with young African-American men in the parts of the Bayview controlled by gangs, some of whom are admitted gang members. He also spoke with Bayview parents and community members. Chaplin monitored Bayview gang activity on the Internet. He continued to investigate crimes linked with Bayview gangs, which included shootings, drug sales, and illegal weapons possession. Since the preliminary hearing, Chaplin had attended a California Gang Investigators Association conference and a Las Vegas police-sponsored gang investigation conference, both of which were dedicated to gang investigations and prosecution. In addition, he had arranged for a college professor (a defense expert) to teach a class to gang task force members and the Bayview plainclothes unit, and for an Orange County gang expert to review the gang task force's criteria for identifying and classifying gang members. Chaplin also taught two classes regarding gang investigations, including a discussion of Bayview gangs. Chaplin continued to informally share gang-related information with other San Francisco police officers.

Appellant asserts that Chaplin's experience in investigating gang crimes and talking to gang members "does not translate into sociological or psychological expertise on gang members' intentions, motivations, and actions under specified circumstances," and "[s]treet experience and police workshops on investigation techniques do not transform officers into behavioral scientists who can predict individual or group behavior." Thus, he argues that Chaplin was not qualified to render the following five opinions:

(1) When asked to generalize about how gang hits are done, Chaplin testified, "Some of them are crime[s] of opportunit[y], some of them are orchestrated events, some of them are orchestrated to get one individual and you end up getting another one. [¶] . . . [¶] . . . So if the guy you're looking for is not there, . . . you're not just going to turn around and run out. You're going to do what you have to do at that point."

(2) When asked, "In the gang culture, Bayview, will a shooter who has a plan to carry out a hit approach an area where other people may be close by?" Chaplin answered affirmatively.

(3) Chaplin testified, "So to murder a police officer, a protector of the community, it sends the ultimate message. . . . [T]he murder of a police officer sends a message to the community that, 'Hey, even your protectors can be touched.' "

(4) Chaplin testified that Newcomb and Newhall was an area where one "would not ever expect to see somebody from West Mob . . . for any reason other than a gang reason, a shooting or a killing."

(5) Chaplin testified that it is not acceptable in gang culture for a gang member to cooperate; it is "looked down upon" and referred to as "snitching."

■ The trial court did not abuse its discretion in finding Chaplin qualified to give the challenged expert testimony. Appellant concedes Chaplin was qualified to testify about Bayview gang "culture." Gang sociology and psychology are proper subjects of expert testimony (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [25 Cal.Rptr.3d 124]) as is "the *expectations* of gang members . . . when confronted with a specific action" (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 658 [126 Cal.Rptr.2d 876] (*Killebrew*); see *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371 [37 Cal.Rptr.2d 596] (*Olguin*) [approving expert testimony "focused on what gangs and gang members typically expect and not on [a defendant's] subjective expectation in this instance"]). Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; gang rivalries; the "motivation for a particular crime, generally retaliation or intimidation"; and "whether and how a crime was committed to benefit or promote a gang." (*Killebrew*, at pp. 656–657.) Chaplin's many years of experience and training demonstrated the special knowledge, skill, experience and training sufficient to qualify him as an expert in these areas. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 949, fn. 4 [44 Cal.Rptr.3d 237, 135 P.3d 649] (*Gonzalez*).)

■ Appellant argues that the challenged testimony exceeded the scope of Chaplin's expertise. Certainly "a person may be qualified as an expert on one subject and yet be unqualified to render an opinion on matters beyond the scope of that subject. [Citations.]" (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1334 [5 Cal.Rptr.2d 130].) But each of the challenged opinions was

within Chaplin's area of expertise. Thus, his expertise on gang culture, habits, and expectations was adequate to permit him to opine that a gang member, intending to shoot a particular gang rival, would shoot a different member of the rival gang if the intended victim was not present, particularly if other people were in the vicinity. This same expertise supports Chaplin's opinion regarding the motivation for a gang member to shoot a police officer and his opinion that gang rivalries effectively exclude particular gangs from certain areas of the city. (See *Gonzalez, supra,* 38 Cal.4th at p. 945.) The trial court could reasonably conclude that Chaplin's expertise rendered him qualified to testify to the challenged opinions.[7]

## C. *Reliable Bases for Gang Expert Opinions*

Appellant contends the court erred in admitting certain of Chaplin's opinions because they were based on unreliable sources and were a "mere regurgitation of police investigation records and conversations with unknown gang members or community residents."[8]

### 1. *Legal Background*

Evidence Code section 801, subdivision (b) limits expert opinion testimony to an opinion "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . ." "[A]*ny material that forms the basis of an expert's opinion testimony must be reliable.* [Citation.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713], italics added (*Gardeley*).) As long as this threshold requirement of reliability is satisfied, even matter ordinarily inadmissible, such as hearsay, can form the proper basis for an expert's opinion testimony. (*Ibid.*) Thus, a gang expert may rely upon conversations with gang members, on his or her personal investigations

---

[7] Separately, appellant argues the court abused its discretion in admitting Chaplin's opinion that it was "significant" that appellant had been observed on numerous occasions in the company of West Mob gang members. Earlier in the trial, other witnesses had testified to these observations. Chaplin testified that appellant's association or affiliation with these gang members was a factor that *helped* establish appellant was a member of a Bayview African-American gang for at least five years before the Espinoza murder. Admitting Chaplin's opinion that these associations were "significant" was not an abuse of discretion. (See *People v. Castenada* (2000) 23 Cal.4th 743, 746 [97 Cal.Rptr.2d 906, 3 P.3d 278].)

[8] Appellant expressly does not challenge the expert testimony regarding "the existence of gangs, police criteria to determine membership, and the meaning of gang graffiti and jargon."

of gang-related crimes, and on information obtained from colleagues and other law enforcement agencies. (See *Gonzalez, supra,* 38 Cal.4th at p. 949 ["A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable."]; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1463 [119 Cal.Rptr.2d 272] (*Duran*); *People v. Gamez* (1991) 235 Cal.App.3d 957, 968 [286 Cal.Rptr. 894] (*Gamez*), disapproved on other grounds in *People v. Gardeley,* at p. 624, fn. 10.)

We review the trial court's admission of expert testimony for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196–197 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506 [68 Cal.Rptr.2d 135].) The trial court's exercise of discretion will not be reversed on appeal except on a showing that that discretion was exercised " ' "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" [Citation.]' [Citations.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225 [57 Cal.Rptr.3d 92] (*Albarran*).) Appellant has the burden of establishing an abuse of discretion and resulting prejudice. (*Ibid.*)

Appellant challenges the reliability of the information underlying the following gang expert testimony by Chaplin: (1) his opinion a violent rivalry existed between West Mob and Big Block; (2) his opinion Allen killed appellant's friend, Dow, and the shooting of Espinoza was meant for Allen; and (3) his opinion regarding the thought processes and behavior of gang members. We consider each in order.

### 2. *Chaplin's Testimony Regarding the Violent Rivalry Between West Mob and Big Block*

To help establish that appellant had a gang purpose in arming himself with an assault weapon prior the Espinoza murder, Chaplin provided an opinion regarding the murderous rivalry between West Mob and Big Block. To support that opinion, Chaplin relied, in part, upon 14 shooting incidents (involving 18 victims, 13 of whom were killed)[9] that occurred between 2000

---

[9] As a separate ground for excluding evidence of the shootings, appellant argues the evidence was irrelevant. These shootings provided the basis for the expert's opinion that a gang war involving appellant's gang had been ongoing between 2000 and 2004; the opinion was relevant to establishing a motive for appellant's possession of the assault weapon on the night of the charged offenses. The trial court did not abuse its discretion in finding this evidence relevant.

and mid-2004.[10] In each of these incidents he relied on statements he had taken from gang members and members of the community, and/or police reports or discussions with police officers investigating the crimes. Physical evidence, such as gang graffiti, was present at some, but not all, of these shootings and supported Chaplin's opinion that the incidents were related to the West Mob/Big Block rivalry. And separate and apart from these shootings, Chaplin read and relied on the federal plea agreement entered into by former Big Block leader Stepney confirming the existence of a violent rivalry with West Mob.

■ In contending that the sources of Chaplin's opinion were unreliable, appellant cites *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786] (*Daubert*) and argues that an expert may not simply rely on hearsay but "must form his opinion by applying his experience and a reliable methodology to the hearsay material upon which he relies." This argument fails for several reasons. First, California has rejected the *Daubert* analysis in favor of the test in *Kelly, supra*, 17 Cal.3d 24. (*People v. Leahy* (1994) 8 Cal.4th 587, 612 [34 Cal.Rptr.2d 663, 882 P.2d 321].) Second, appellant has cited no California authority for the proposition that a gang expert's opinion is subject to the *Kelly* test or that it must be based on a "reliable methodology," and, generally speaking, *Kelly* does not

---

[10] As to the 14 incidents, Chaplin testified that:

(1) The April 7, 2000 shootings of West Mob members David George and James Hill were gang related and BNT members were responsible for it.

(2) The April 29, 2000 murder of Patrick Brown was gang related.

(3) The May 3, 2000 double murder of Starvell Junious and Jarvis Baker on Third Street was gang related.

(4) The December 31, 2000 double murder of BNT/Kirkwood members Brian Williams and Curtis Layne at Third and Kirkwood was gang related and committed by West Mob.

(5) The March 10, 2001 murder of West Mob member Tyrone Laury was gang related and committed by Big Block.

(6) The May 1, 2001 murder of Alvin McAldry at Middle Point and Hare was gang related. West Mob member Ricky "Hitman" Heard was shot in the legs in that incident.

(7) The July 5, 2001 murder of Darrell Lewis at West Point was committed by West Mob. Prior to being murdered, Lewis punched West Mob member Kenyana Jones for committing domestic violence against Lewis's niece.

(8) The October 18, 2001 murder of West Mob member Frank Hall was gang related.

(9) The June 21, 2002 murder of West Mob member John Kelley was gang related.

(10) The June 29, 2002 murder of Osceola Mob member Rashad Young at Osceola and LaSalle was gang related.

(11) The December 26, 2002 shooting of Charles Hollins was gang related.

(12) The February 2, 2003 murder of West Mob member Heard by Big Block was gang related.

(13) The October 21, 2003 shooting of West Mob member Lee Collins was gang related.

(14) The February 1, 2004 murder of Dow at West Point and Middle Point was gang related. The suspect in the Dow shooting was Allen.

Chaplin appeared to select these 14 incidents from the "hundreds of shootings and killings we've investigated in the area" during the relevant timeframe.

apply to the type of expert testimony provided by Chaplin. "In applying the *Kelly* standard, it is important to distinguish between expert testimony and scientific evidence; the former is not subject to the special admissibility rule of *Kelly*, which applies to cases involving novel devices or processes. [Citations.]" (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1195 [103 Cal.Rptr.2d 908].) Third, the argument that Chaplin simply received and " 'repeat[ed] hearsay evidence without applying any expertise whatsoever' " (*U.S. v. Mejia* (2d Cir. 2008) 545 F.3d 179, 197) ignores the extensive background to which he testified.

■ To the extent appellant argues that a gang expert may not rely on the hearsay statements of gang members, appellant is wrong. (*Gardeley, supra*, 14 Cal.4th at p. 618; *Duran, supra*, 97 Cal.App.4th at p. 1463.) *Gamez* is instructive. In that case, the court upheld the admissibility of testimony by gang experts whose opinions were based on personal observations and experience, the observations of other law enforcement officers, police reports, and conversations with gang members. (*Gamez, supra*, 235 Cal.App.3d at pp. 966–969.) In rejecting the defendant's argument that the officers' reliance upon information received from unidentified parties violated the Evidence Code, the *Gamez* court stated, "We fail to see how the officers could proffer an opinion about gangs, and in particular about gangs in the area, without reference to conversations with gang members." (*Gamez*, at p. 968.) Further, the court stated: "While the credibility of those sources may not be beyond reproach, nevertheless, . . . '[t]he variation in the permissible bases of expert opinion is unavoidable in light of a wide variety of subjects upon which such opinion can be offered.' [Citation.] To know about the gangs involved, the officers had to speak with members and their rivals. Furthermore, the officers did not simply regurgitate that which they had been told. Rather, they combined what they had been told with other information, including their observations, in establishing a foundation for their opinions. . . . [¶] While we are sensitive to defendant's concern that a conviction not be based on hearsay testimony, that is not what occurred here. The officers did not simply recite what they had been told, but instead provided foundational testimony for their opinions which was sufficiently corroborated by other competent evidence, both physical and testimonial." (*Id.* at pp. 968–969.)

The reasoning in *Gamez* is applicable here. Chaplin testified he had worked with the gang task force since 1999, investigating African-American gangs in San Francisco, particularly in the Bayview. He had received training at gang seminars, obtained on-the-job training from other gang task force members, and read books and journal articles about gangs. He had daily conversations with gang members in the Bayview and did followup interviews after making gang-related arrests. He had participated in about 600 gang investigations. Although some of the information he received was hearsay, he attempted to corroborate that information.

To comprehend the dynamics of gang rivalry in the Bayview, Chaplin had to be familiar with the typical behavior of Bayview gang members. One significant source of this information was the people involved. Although the credibility of individual gang members might be questionable, Chaplin was not simply recounting or "regurgitating" what he had been told. He made clear that he was relying on his many years of experience and hundreds of communications as one part of the foundation for his testimony. Chaplin's testimony adequately explained the basis for his opinion regarding the West Mob/Big Block rivalry and demonstrated the reliability of the evidence he relied on. (See *Gonzalez, supra,* 38 Cal.4th at p. 949.) No error has been demonstrated.

### 3. *Chaplin's Testimony Regarding the Shooting of Dow*

The murder of Dow was one of the 14 shooting incidents described by Chaplin. Appellant argues that no reliable basis exists for Chaplin's testimony that the Dow murder was gang related and that Allen committed it. We disagree. First, there is clear evidence that Dow's shooting was gang related. It was a driveby shooting and the firearm used was found one week after the shooting in the possession of Joseph Young, a member of a rival gang. Second, Allen was considered a suspect in that shooting by the investigating officers and had told Chaplin that he was a target for retaliation by West Mob "[b]ecause of some shit they think I did." Allen also said the shooting of "Espinoza was meant for me." Third, Allen and Young belonged to the same gang and were close associates in that gang. Fourth, Young himself did not shoot Dow because Young was in custody at the time. Finally, included in the information available to Chaplin were statements by Berry Adams, a West Mob member, describing Adams's role in arming appellant and driving him to Newhall and Newcomb to shoot Allen.[11]

Appellant argues that the hearsay provided by Allen was a key piece of evidence relied on by Chaplin to conclude that on April 10, 2004, appellant sought revenge for Allen's murder of Dow. Chaplin testified that on May 3, 2004, he talked with Allen outside Allen's residence at 1662 Newcomb, and Allen provided the statements related above. On cross-examination, Chaplin said he did not know the source of Allen's information. However, Chaplin said that based on what he had discovered throughout the investigation leading up to trial, Chaplin was convinced Allen was correct. Chaplin conceded that, in the past, Allen had lied to police about whether or not he possessed a gun or drugs. But simply because a gang member has lied to the

---

[11] The trial court precluded Chaplin from testifying about statements Adams made to Chaplin after it found Adams legally unavailable to testify as a witness at trial because Adams had invoked his Fifth Amendment right to refuse to answer questions the defense wished to pose regarding uncharged homicides.

police in the past about his possession of contraband does not preclude a conclusion that he is a reliable source of information supporting a gang expert's opinion. (See *Gonzalez, supra*, 38 Cal.4th at p. 949; *Gamez, supra*, 235 Cal.App.3d at p. 968.)

### 4. *Chaplin's Testimony Regarding the Thought Process and Behavior of Gang Members*

Appellant challenges the bases for Chaplin's opinions "as to what gang members think and how they behave, in particular[, Chaplin's] claims that if the intended target is not there, you end up getting someone else, that the killing of a police officer sends the 'ultimate message' of gang reputation, [and] a West Mob member would not go to Newhall and Newcomb except to commit a gang shooting or killing." We have already explained that Chaplin was qualified to provide these opinions, and gang expert opinions of this nature have consistently been upheld in the past. (*Olguin, supra*, 31 Cal.App.4th at p. 1370 [importance of respect and exclusive gang turf to street gangs, which react violently to disrespect]; *Gamez, supra*, 235 Cal.App.3d at p. 968, fn. 3 [retaliation]; *Killebrew, supra*, 103 Cal.App.4th at p. 656 [violence results when one gang goes to another gang's turf].) We also previously noted Chaplin's extensive experience and training, which provided reasonable bases for these opinions. Citing *U.S. v. Mejia, supra*, 545 F.3d 179, appellant contends Chaplin failed to explain how he "analyzed his knowledge and experience to reach a studied conclusion." But each of Chaplin's opinions flows logically from his testimony regarding the importance to each gang of its reputation, and how this triggers a retaliatory dynamic of violence. This retaliatory violence, in turn, creates exclusive zones where rival gang members may not go safely. A West Mob member, for example, could not walk safely on Big Block turf. If a West Mob member, armed with an assault weapon, was present on Big Block turf, it is reasonable to conclude he was there to retaliate for prior violence, not to engage in a peaceful pursuit. And if the intended Big Block victim was absent, it is reasonable to conclude the West Mob member would try to shoot a different Big Block member who was present; the shooter would not just "turn around and run out." Finally, when animosity toward the police resulted in the shooting of an officer, the gang's reputation was enhanced by, as Chaplin explained, sending "a message to the community, 'Hey, even your protectors can be touched.' "

Because each of the challenged opinions is rooted in other opinions properly reached by Chaplin, admitting them was not an abuse of the trial court's discretion.

### D. *The Admissibility of Out-of-court Statements Relied on by Chaplin to Support His Opinions*

As we discussed in parts I.B. and I.C., Chaplin was qualified to render his opinions and, because they were based on reliable information, he was permitted to testify to those opinions. In addition, on direct examination the court allowed Chaplin to provide the jury with some of the information serving as the basis of these opinions (basis evidence) as well as the sources of the information.[12] Some of this basis evidence consisted of out-of-court statements, and appellant contends that permitting Chaplin to testify to those statements violated the hearsay rule and the confrontation clause of the Sixth Amendment to the United States Constitution.[13] In this part of the opinion, we focus on two of the opinions Chaplin rendered: (1) there was an ongoing violent rivalry between West Mob and Big Block; and (2) appellant had a gang purpose in being present at the corner of Newhall and Newcomb while armed with an assault rifle.

In his briefing, appellant argues that the following out-of-court statements, introduced as basis evidence for these opinions, were admitted for their truth: (1) Allen told Chaplin the Espinoza shooting was "meant for [Allen]"; (2) in his federal plea agreement, Stepney stated he had been the leader of Big Block since its inception, and had been involved in a "war" with West Mob and participated in driveby shootings; (3) West Mob member Tony Bedford told Chaplin he had taken an assault rifle away from younger West Mob members because they were planning a retaliatory shooting on Harbor Road; (4) Kevin Butler told Chaplin the murder of Hall was possibly an internal West Mob murder; and (5) Terrence Joseph told Chaplin West Mob members could not buy drugs at Newhall and Newcomb.

In admitting this evidence, the trial court relied principally on *Thomas, supra*, 130 Cal.App.4th 1202, to conclude the statements were not introduced for their truth, but only to assist the jury in evaluating Chaplin's opinion. Though we disagree with *Thomas*'s analysis of this important issue, *Thomas* appropriately relies on relevant Supreme Court precedent, principally *Gardeley, supra*, 14 Cal.4th 605, that we are required to follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Consequently, we may not find erroneous the trial court's conclusion that the challenged statements were not admitted for their truth. This determination precludes appellant's challenge under state hearsay rules

---

[12] Evidence Code section 802 provides, in pertinent part: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based . . . ."

[13] In pertinent part, the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

and the confrontation clause. (*Crawford, supra*, 541 U.S. at p. 59.) However, we respectfully critique *Thomas* and its antecedents and propose an approach that preserves *Gardeley*'s goals, while recognizing the reality of how jurors treat out-of-court statements admitted as basis evidence.

### 1. *Current California Law*

The Evidence Code states that an expert witness may, on direct examination, provide the reasons for an opinion as well as the information upon which it is based, even if that information is inadmissible. (Evid. Code, §§ 801, subd. (b), 802.) In analyzing Evidence Code section 802, our Supreme Court has allowed an expert to testify about basis evidence consisting of out-of-court statements. In *People v. Catlin* (2001) 26 Cal.4th 81, 137 [109 Cal.Rptr.2d 31, 26 P.3d 357], the court stated, " '[a]n expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible . . . . [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. . . .' [Citations.]" (See *Gardeley, supra*, 14 Cal.4th at pp. 618–619; *People v. Carpenter* (1997) 15 Cal.4th 312, 403 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Price* (1991) 1 Cal.4th 324, 416 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189].) This basis evidence is inadmissible, however, for its truth. (*Gardeley*, at p. 619 [testimony relating the basis evidence may not "transform inadmissible matter into 'independent proof' of any fact"]; see *People v. Vanegas* (2004) 115 Cal.App.4th 592, 597–598 [9 Cal.Rptr.3d 398].) The trial court in *Gardeley* had instructed the jury that the out-of-court statements related by the gang expert were not elicited " 'for the truth of the matter,' " but only to allow the jury to evaluate the expert's opinion. (*Gardeley*, at p. 612.) *Gardeley* held the trial court correctly determined that "an expert witness . . . could reveal the information on which he had relied in forming his expert opinion, including hearsay" (*id.* at p. 619), and that the jury " 'may not consider those [hearsay] statements for the truth of the matter,' " but only to evaluate the expert opinion (*id.* at p. 612).

This approach to basis evidence is not uncommon. For example, effective December 1, 2000, rule 703 of the Federal Rules of Evidence (28 U.S.C.) was amended to reflect a similar, though not identical, approach: "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion . . . unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."[14] The Committee Notes on Rules—2000

---

[14] Under California law, basis evidence is presumptively admissible, though under Evidence Code section 352, the trial court may exclude it if the likelihood of undue prejudice resulting from it substantially outweighs its probative value. Rule 703 of the Federal Rules of Evidence

Amendment, following rule 703, provides, "When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting the jury to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other."

*Thomas* followed the "long established" principles expressed in *Gardeley*. (*Thomas, supra*, 130 Cal.App.4th at p. 1209.) It concluded that the out-of-court statements admitted as basis evidence were not admitted for their truth but only to help evaluate the expert's opinion, and for this reason the confrontation clause did not apply. (*Thomas*, at pp. 1209–1210.) The trial court here took the same approach.

### 2. *A Critique of the Current Law*

In *Gardeley*, the gang expert opined that an assault was gang related and, as part of the basis evidence, testified he had been told by one of the assailants that the individual was a gang member. (*Gardeley, supra*, 14 Cal.4th at pp. 612–613.) In *Thomas*, after opining the defendant was a member of a gang, the expert was allowed to testify that in forming the opinion he had relied on statements from other members of that gang that defendant was a member. (*Thomas, supra*, 130 Cal.App.4th at pp. 1205–1206.) *Thomas* rejected a confrontation clause challenge after concluding the out-of-court statements were not admitted for their truth. "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are *not elicited for the truth* of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*Thomas*, at p. 1210, italics added; see *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153–154 [94 Cal.Rptr.3d 98] [out-of-court statements admitted as basis evidence are not admitted for their truth, but only to assess the weight of the expert's opinion]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 [64 Cal.Rptr.3d 96] [same]; *People v. Cooper* (2007) 148 Cal.App.4th 731, 746–747 [56 Cal.Rptr.3d 6] [same].)

Central to the reasoning in *Gardeley* and *Thomas* is the implied assumption that the out-of-court statements may help the jury evaluate the expert's

---

(28 U.S.C.) states the converse: otherwise inadmissible basis evidence is excluded unless its probative value substantially outweighs its prejudicial effect.

opinion without regard to the truth of the statements. Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical. But this assumption appears to be incorrect.

In *People v. Goldstein* (2005) 6 N.Y.3d 119 [810 N.Y.S.2d 100, 843 N.E.2d 727] (*Goldstein*), New York State's highest court rejected reasoning identical to that in *Gardeley* and *Thomas*. In *Goldstein*, the defendant was charged with murdering a woman by pushing her in front of a subway train. (*Goldstein*, 843 N.E.2d at p. 729.) The prosecution's forensic psychiatrist (Hegarty) relied upon and testified to certain out-of-court statements that helped form the basis for her opinion refuting an insanity defense.[15] (843 N.E.2d at pp. 729–730.) The prosecution argued that the statements were not admitted for their truth but only to help the jury evaluate Hegarty's opinion. (*Id.* at p. 732.) The *Goldstein* court disagreed. "We do not see how the jury could use the statements . . . to evaluate Hegarty's opinion without accepting as a premise either that the statements were true or that they were false. Since the prosecution's goal was to buttress Hegarty's opinion, the prosecution obviously wanted and expected the jury to take the statements as true. . . . The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful in this context." (*Id.* at pp. 732–733.)[16]

---

[15] Hegarty relied upon out-of-court statements by a security guard who had apprehended the defendant following an earlier violent attack on a different woman and by an acquaintance of the defendant, who related an incident in which a woman, who looked remarkably like the murder victim, had "sexually frustrated" the defendant. (See *Goldstein, supra*, 843 N.E.2d at pp. 729–730.)

[16] Substantial academic commentary agrees. (See Kaye et al., New Wigmore Treatise on Evidence (2010 Cumulative Supp.) Expert Evidence, § 3.10.1, p. 59 (Kaye) ["To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true. If the jury believes that the basis evidence is true, it will likely also believe that the expert's reliance is justified; conversely, if the jury doubts the accuracy or validity of the basis evidence, that presumably increases skepticism about the expert's conclusions. The factually implausible, formalist claim that experts' basis testimony is being introduced only to help in the evaluation of the expert's conclusions but not for its truth ought not permit an end-run around a constitutional prohibition." (fn. omitted)]; Mnookin, *Expert Evidence and the Confrontation Clause After Crawford v. Washington* (2007) 15 J.L. & Pol'y 791, 816 (Mnookin) ["To say that [inadmissible] evidence offered for the purpose of helping the jury to assess the expert's basis is not being introduced for the truth of its contents rests on an inferential error."]; Oliver, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 After* Crawford v. Washington (2004) 55 Hastings L.J. 1539, 1555–1560.) Professor Mnookin sets out a lengthy list of pre-*Crawford* academic commentary on this issue. (Mnookin, *supra*, at p. 803, fn. 24.)

We agree with *Goldstein* that where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion.[17]

It is noteworthy that the California Supreme Court decisions concluding basis evidence is not admitted for its truth were reached before the United States Supreme Court reconsidered the confrontation clause in *Crawford, supra,* 541 U.S. 36. (See discussion in pt. I.D.1.) Since that reconsideration, there has been a heightened concern regarding an expert's disclosure of basis evidence consisting of out-of-court statements. (Kaye, *supra,* § 3.10, p. 56.) And, although the California Supreme Court considered the hearsay implications of such evidence, none of the cases specifically considered the argument raised by appellant here: admitting the out-of-court statements to *evaluate* the opinion effectively admitted them for their *truth.*

But for the long line of California Supreme Court precedent supporting *Thomas,* we would reject that opinion and adopt *Goldstein*'s logic, which seems compelling. But our position in the judicial hierarchy precludes that option; we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority.[18] We conclude that the trial court here properly determined that the challenged basis evidence related by Chaplin was not offered for its truth but only to evaluate Chaplin's opinions. Therefore, its admission did not violate the hearsay rule or the confrontation clause.[19]

---

[17] This would seem to apply even to specialized knowledge gained by an expert in an academic setting. For example, if an accident reconstruction expert relies on and testifies to a formula he or she learned that is used to derive vehicle speed from the length of a skid mark, the jury seemingly may use that evidence to evaluate an opinion on the cause of the accident only after deciding if, or assuming that, the formula is accurate.

[18] There is some reason to believe that the California Supreme Court may be prepared to recognize the logical error in *Gardeley* and *Thomas. People v. Geier* (2007) 41 Cal.4th 555 [61 Cal.Rptr.3d 580, 161 P.3d 104] (*Geier*) involved a Sixth Amendment challenge to a DNA expert's testimony. The expert opined on the probability of a match between the defendant's DNA and the DNA extracted from the vaginal swabs of a rape-murder victim in reliance on a nontestifying technician's report regarding the technician's comparison of the known and unknown DNA samples. The court impliedly assumed the information in the technician's report was admitted for its truth, but concluded no *Crawford* error occurred because the report was not testimonial. (41 Cal.4th at pp. 605–607.)

[19] Appellant argues that even if the hearsay statements he challenged were not admitted for their truth, they should have been excluded because, under *Tennessee v. Street* (1985) 471 U.S. 409 [85 L.Ed.2d 425, 105 S.Ct. 2078] (*Street*), they were not critical to the prosecution's case and could have been redacted or paraphrased to blunt the risk of improper use by the jury. We reject that argument because appellant forfeited this claim by failing to raise it below. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [35 Cal.Rptr.3d 644, 122 P.3d 765].) To the extent appellant claims he satisfied this requirement by citing *Crawford,* which had cited *Street,* we disagree because *Crawford* did not cite *Street* for this proposition.

### 3. *Implications of Accepting the* Goldstein *Analysis*

If our Supreme Court reconsiders *Gardeley* and adopts *Goldstein*'s conclusion that basis evidence is offered for its truth, we would face significant issues of admissibility under the hearsay rule as well as the confrontation clause. We examine these issues in the context of the five challenged statements admitted to evaluate Chaplin's opinions. Three of these statements could be utilized by the jury for this purpose only after deciding if they were true. Further, the prosecution seems to have intended for the jury to accept the statements as true.

Chaplin testified Allen told him that West Mob was out to get him (Allen) "[b]ecause of some shit they think I did. [¶] . . . [¶] That shit that happened to Espinoza was meant for me." Chaplin testified he believed the statement was true based "on what I've discovered throughout the investigation." The prosecutor treated the statement as true, arguing appellant was at the corner of Newhall and Newcomb to shoot Allen on the night the officers were shot. As with Hegarty's testimony in *Goldstein*, Chaplin's opinion that appellant had a gang-related purpose for being in the area of Newhall and Newcomb finds support in Allen's statement only if that statement is believed to be true. Similarly, Chaplin's testimony about the contents of Stepney's federal plea agreement is useful in evaluating Chaplin's opinion that a gang war existed only if the jury decides or accepts that Stepney's statements are true. In addition, Joseph's statement to Chaplin that West Mob members could not buy drugs at Newhall and Newcomb supports Chaplin's opinion to that effect only if it is believed to be true.[20]

#### (a) *The Hearsay Rule and Basis Evidence*

In our case, each of the three challenged statements that the jury considered for its truth would be barred by the hearsay rule under *Goldstein*'s analysis. In fact, adopting this analysis would exclude from evidence, as hearsay, many if not most of the out-of-court statements serving as basis evidence in civil and criminal cases. The Supreme Court may conclude that this is too costly a result because it will deprive jurors of highly useful information. If so, the court should create a hearsay exception admitting such statements for their truth, but limiting their admissibility to assisting the jurors' evaluation of the opinion. Significantly, if our high court adopts the

---

[20] Butler's statement about the murder of Hall seems irrelevant to or inconsistent with Chaplin's opinion that West Mob was engaged in a gang war because it suggests West Mob members killed another member of their own gang. Clearly, it was not admitted for its truth. And Bedford's statement about weapon sharing seems irrelevant to the facts of this case as they developed at trial because no evidence of weapon sharing was admitted with regard to the charged offenses.

*Goldstein* analysis, but fails to adopt a suitable hearsay exception, trial courts will often lack the discretion to admit out-of-court statements relied upon by the expert.

Since the adoption of the Evidence Code, the judicial creation of nonstatutory hearsay exceptions has been uncommon. In 1997, the California Supreme Court approved the child dependency hearsay exception, created by the Court of Appeal in *In re Carmen O.* (1994) 28 Cal.App.4th 908 [33 Cal.Rptr.2d 848]. (*In re Cindy L.* (1997) 17 Cal.4th 15 [69 Cal.Rptr.2d 803, 947 P.2d 1340].) After concluding that appellate courts have the authority to create additional hearsay exceptions (*id.* at pp. 25–27), the Supreme Court went on to "emphasize that in developing new exceptions to the hearsay rule, courts must proceed with caution" (*id.* at p. 27). "Despite this cautionary note, it may nonetheless be appropriate for courts to create hearsay exceptions for classes of evidence for which there is a substantial need, and which possess an intrinsic reliability . . . . [Citation.]" (*Id.* at p. 28.)

Both "substantial need" and "intrinsic reliability" seem to exist here. The importance of providing the jury with basis evidence in the appropriate case appears substantial. Section 802 of the Evidence Code, rule 703 of the Federal Rules of Evidence (28 U.S.C.), and numerous California appellate court opinions implicitly recognize its importance and authorize its admission. *Gardeley* was no outlier. (*Gardeley, supra,* 14 Cal.4th at pp. 618–619; *People v. Coleman, supra,* 38 Cal.3d at pp. 91–92, and cases cited therein.) Moreover, these hearsay issues will exist even where experts testify in a context free from confrontation clause concerns: in civil cases and in criminal cases where a defense expert testifies. Finally, creating a hearsay exception for this basis evidence not only seems to respond to a substantial need but does no more than maintain the status quo that admits this evidence under a different rationale.

■ The reliability of such basis evidence is ensured by subdivision (b) of Evidence Code section 801 (the expert's opinion must be based on matter "whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"). Moreover, in considering reliability, it is important to keep in mind that the admissibility of such hearsay is expressly limited to evaluating the opinion. This basis evidence is not admissible as independent proof of the facts stated therein or to help establish a prima facie case. Finally, if the trial court is concerned the jury will utilize the basis evidence improperly, it retains the discretion granted by Evidence Code section 352 to exclude it, even if the proposed hearsay exception is created. (Cf. *Gardeley, supra,* 14 Cal.4th at p. 619.)

### (b) Crawford *and Basis Evidence*

Though it would eliminate the hearsay problems resulting from the acceptance of *Goldstein*'s analysis, the proposed common law hearsay exception would not alleviate the confrontation clause issues. However, under *Crawford*, much of this basis evidence would be admissible.

 The confrontation clause protects a criminal defendant's right to confront and cross-examine the witnesses against him. In *Crawford, supra*, 541 U.S. 36 and its progeny, the United States Supreme Court has concluded that where a prosecutor attempts to introduce an out-of-court statement for its truth, even if the statement is admissible under state law hearsay rules, it is barred by the confrontation clause if the statement is "testimonial," unless the declarant was available at trial and subject to cross-examination, or if unavailable at trial, had been subject to an earlier cross-examination. (*Davis v. Washington* (2006) 547 U.S. 813, 821 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*); *People v. Cage* (2007) 40 Cal.4th 965, 978, fn. 7 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*).)

"Testimonial" is a critical component of the new analysis, but *Crawford* made no attempt to provide an overarching definition of the term. In *Crawford*, the court concluded that a witness statement obtained in a custodial interrogation was testimonial. (*Crawford, supra*, 541 U.S. at pp. 52, 53, fn. 4.) *Davis* considered statements in two different factual contexts. Statements by a domestic violence victim in a 911 call made during an ongoing emergency were determined to be nontestimonial. (*Davis, supra*, 547 U.S. at p. 827.) Statements by a different domestic violence victim in her home to the police were testimonial because the assault against her was complete and officers had removed the assailant to another part of the house. (*Id.* at pp. 829–830.) In *Cage*, the California Supreme Court concluded a victim's statement made to a police officer one hour after the assault was testimonial where the primary purpose of the conversation was to investigate the prior assault. (*Cage, supra*, 40 Cal.4th at pp. 984–986.)

*Cage* reached this result after deriving several basic principles from *Davis* regarding the definition of "testimonial": "First . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was

given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984, fns. omitted.)

In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. ___ [174 L.Ed.2d 314, 129 S.Ct. 2527] (*Melendez-Diaz*) and *Geier, supra,* 41 Cal.4th 555, the United States and California Supreme Courts, respectively, defined "testimonial" in the context of expert evidence. In *Melendez-Diaz,* the court held testimonial a sworn affidavit submitted by the prosecution in a drug prosecution, which stated that the substance seized from the defendant was cocaine of a certain weight. (*Melendez-Diaz,* at pp. ___–___ [129 S.Ct. at pp. 2530–2532].) *Geier* found nontestimonial a testifying DNA expert's recitation of a nontestifying technician's report in which the technician set out her compliance with a laboratory protocol and her observations regarding the genetic profiles extracted from a known and an unknown sample of DNA. (*Geier,* at pp. 593–607.) It is noteworthy that *Melendez-Diaz* and *Geier*[21] assumed that the definition of "testimonial" articulated in *Davis* governed; neither case suggested that a different meaning was required because expert testimony was at issue.[22]

(c) Crawford *and the Basis Evidence in this Case*

Even if admitted for their truth, only one of the five challenged statements here would be considered testimonial. Allen provided his statement to Chaplin in an informal, unstructured setting. While driving in the vicinity of Newhall and Newcombe, Chaplin saw Allen run into his residence. Chaplin talked to two men outside the residence and then Allen came outside and Chaplin talked to him. There is no evidence that Allen was under arrest or that the circumstances surrounding the conversation were sufficiently formal that Allen's statements were analogous to testimony. Chaplin had worked on

---

[21] The California Supreme Court has granted review in several cases to examine the effect of *Melendez-Diaz* on *Geier.* (See, e.g., *People v. Rutterschmidt,* review·granted Dec. 2, 2009, S176213; *People v. Gutierrez,* review granted Dec. 2, 2009, S176620; *People v. Lopez,* review granted Dec. 2, 2009, S177046.)

[22] Indeed, the *Melendez-Diaz* court rejected the dissent's suggestion that the confrontation clause was inapplicable because the drug analysts were not " 'conventional witnesses' " who had observed the crime or " 'any human action related to it.' " (*Melendez-Diaz, supra,* 557 U.S. at p. ___ [129 S.Ct. at p. 2535].)

the gang task force since 1999 and, in his role as a gang expert, he spoke with gang members on a daily basis, "[w]henever [he was] in the Bayview." Nothing distinguishes the nature of his conversation with Allen from hundreds of others he had conducted. Further, nothing in the record suggests that Chaplin was investigating Espinoza's murder at the time of the conversation with Allen, or that his purpose in engaging in the conversation was to develop information regarding that homicide or any other specific crime. In fact, though Chaplin prepared a field interview card concerning this conversation on the date it occurred, he did not record Allen's statement that the Espinoza shooting had been "meant for him" until a year later. This conversation lacked any indicia of testimony and, under *Crawford* and *Davis*, Allen's statements were not testimonial. (Kaye, *supra*, § 3.10, p. 57 [When "an expert in gang structure relies on interviews conducted with former gang members over many years and not related to the particular case, no plausible understanding of 'testimonial' would encompass these statements."].)

Similarly, Chaplin's interviews with gang members about the rivalry between West Mob and Big Block, and with Bedford, Butler and Joseph, were not testimonial. Many, perhaps all, of these statements were obtained from people in custody. However, as discussed above, in his role as a gang expert, Chaplin constantly interviewed Bayview residents, including gang members, to learn about gang structure, culture and sociology. The custodial status of the interviewees, without more, is not enough. We have no basis for concluding Chaplin's interviews were part of a specific criminal investigation or that any participant in these conversations had, as a primary purpose, "to establish or prove some past fact for possible use in a criminal trial." (*Cage, supra*, 40 Cal.4th at p. 984.) The statements elicited in these interviews are no more testimonial than the facts recited in a treatise read by an expert in an academic setting, as he or she develops expertise in the field.[23]

The federal plea agreement containing Stepney's statements testified to by Chaplin is, however, the type of formalized document that *Crawford* and *Davis* would treat as testimonial. (*U.S. v. McClain* (2d Cir. 2004) 377 F.3d 219, 221 [a guilty plea allocution is testimonial]; accord, *U.S. v. Hardwick*

---

[23] Appellant also contends that Chaplin's reliance on nontestimonial hearsay violated appellant's rights to due process and confrontation pursuant to *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] (*Roberts*). *Roberts* had been the leading case defining the confrontation clause before *Crawford* overruled it. (*Crawford, supra*, 541 U.S. at pp. 62–68.) In *Cage, supra*, 40 Cal.4th at page 982, footnote 10, our Supreme Court noted that after *Davis*, "there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution." Moreover, as we previously noted, Chaplin did not rely on any unreliable information in reaching his opinions, and appellant's conclusory claim of error under *Roberts* fails to specify any nontestimonial hearsay as unreliable. No due process violation is demonstrated.

(2d Cir. 2008) 523 F.3d 94, 98.) If we treat Stepney's statements as admitted for their truth, their admission would violate the confrontation clause.[24]

### 4. *Conclusion*

Appellant challenged the admissibility of certain out-of-court statements relied on by Chaplin to support his opinions. Following *Thomas*, the trial court concluded none of this basis evidence was admitted for its truth and overruled objections under the hearsay rule and the confrontation clause. Though free to disagree with *Thomas*, we must follow relevant Supreme Court precedent; that precedent compels the result reached by the trial court. Thus we affirm its ruling.

We note, however, our disagreement with that precedent. In our view, the *Goldstein* analysis is the correct one: several of the challenged statements were introduced for their truth, in the sense that the jury was not able to utilize the out-of-court statements to evaluate the opinion rendered without first determining if, or accepting that, those statements were true. If our Supreme Court agrees, it may minimize the exclusionary effect of that conclusion by adopting a hearsay exception. If the Supreme Court proceeded in that fashion, the new rule would not affect the result we reach. Though several of the challenged statements would be admitted for their truth, the proposed new hearsay exception would eliminate the attendant hearsay problems, and the trial court would retain the same discretion it currently has under Evidence Code section 352 to exclude the otherwise admissible evidence. The definition of "testimonial" would eliminate confrontation clause issues with all but one of the challenged sets of statements, those found in Stepney's plea agreement. And, any error in permitting testimony about Stepney's statements would be harmless.

### E. *The Admissibility of Eight Predicate Gang-related Offenses and 14 Gang Shootings*

### 1. *Eight Predicate offenses*

Chaplin testified to eight predicate offenses to prove that appellant possessed an assault rifle for the benefit of, at the direction of, or in

---

[24] In the particular facts of this case, admitting the Stepney plea agreement, though error, would not have been reversible, even under the stringent *Chapman* test. Under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], a federal constitutional error requires reversal unless the prosecution demonstrates the error was harmless beyond a reasonable doubt. (*Id.* at p. 24.) Admissible evidence of a violent gang war between West Mob and Big Block was overwhelming and undisputed. Beyond a reasonable doubt, this error would be harmless.

association with, a criminal street gang (§§ 12280, subd. (b), 186.22, subd. (b)(1)). "To prove the allegations under section 186.22, subdivisions (a) and (b), the prosecutor was required to establish that one of the gang's primary activities was the commission of one or more of the crimes listed in [Penal Code] section 186.22, subdivision (e), and that the gang's members engaged in a pattern of criminal activity. [Citation.] . . . '[S]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.' [Citation.] . . . [A] 'pattern' is established by the commission of two or more enumerated offenses committed on separate occasions or by two or more persons. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 608–609 [88 Cal.Rptr.3d 401] (*Williams*).)

Prior to trial, the prosecution sought to admit evidence of 10 predicate offenses allegedly committed by West Mob members beginning in 1999. In response, appellant argued that, pursuant to Evidence Code section 352, the prosecution should be limited to eliciting evidence of three predicate offenses, and none of the predicate offenses should include offenses by appellant's family members.

The court said it understood the prosecution's need to present evidence of more than the two statutorily required predicate offenses, and exercised its discretion to allow proof of eight such offenses through court documents and the testimony of Chaplin.[25] Appellant argues four predicate offenses would have been "sufficiently safe to withstand theoretical challenges," and therefore the admission of eight such offenses was cumulative and unduly prejudicial (Evid. Code, § 352).

---

[25] Chaplin subsequently testified:

(1) In 2004, David Hamilton pled guilty to a federal charge that in December 2003 he possessed cocaine with intent to distribute in the area of West Point and Middle Point.

(2) In 2004, West Mob member Bedford pled guilty to a January 2003 felony assault and admitted to Chaplin it was gang related.

(3) In 2002, gang member Trearl Malone pled guilty to robbery and possession of cocaine with intent to sell.

(4) In 2005, Willie Hill pled guilty to a federal charge that in July 2002 he sold crack cocaine in the area of West Point and Middle Point. Though Willie Hill is appellant's brother, appellant has not alleged the jury was apprised of this fact.

(5) In 2005, Kevin George was convicted of a federal charge of possession of cocaine with intent to distribute and sell in the area of West Point and Middle Point.

(6) In 2001, West Mob members Anthony Knight and Marcus Colbert pled guilty to a 2000 robbery committed while both men were in possession of firearms.

(7) In 2000, Marquell Cain pled guilty to possession of cocaine with intent to sell. Chaplin could not express an opinion as to whether this offense was gang related.

(8) In 2001, Butler pled guilty to a robbery committed in 2000 and possession of cocaine for sale which occurred at West Point and Middle Point.

In *Williams, supra,* 170 Cal.App.4th at pages 608–609, the prosecutor introduced evidence of at least eight crimes committed by gang members in an effort to establish the predicate crimes for the gang charge and gang enhancement allegations. In response to the defendant's assertion that the evidence was cumulative and unduly prejudicial under Evidence Code section 352, the trial court ruled, " 'the [district attorney] is entitled to the full force of their evidence. If they want to over-prove their case or put on all the evidence that they have, that's their right.' " (*Williams,* at p. 610.) On appeal, the appellate court strongly disagreed with this reasoning, concluding the trial court "must take great care to evaluate its admissibility," and "must find that the evidence has substantial probative value . . . not outweighed by its potential for undue prejudice." (*Ibid.*) It stated, "We strongly disagree with the view that prosecutors have any right to 'over-prove their case or put on all the evidence that they have.' " (*Ibid.*) "Although no bright-line rules exist for determining when evidence is cumulative, we emphasize that the term 'cumulative' indeed has a substantive meaning, and the application of the term must be reasonable and practical. Here . . . we conclude it was an abuse of discretion to admit cumulative evidence concerning issues not reasonably subject to dispute." (*Id.* at p. 611.) The court found that the volume of evidence extended the trial "beyond reasonable limits" and resulted in a "virtual street brawl" and "endless discussions" among counsel and the trial court on the admissibility of the evidence. (*Ibid.*)

We do not read *Williams* to create an artificial limit of seven (or fewer) predicate offenses to prove the gang enhancement. The trial court here exercised its discretion and eliminated two offenses the prosecution sought to introduce. This ruling created neither a "street brawl" nor "endless discussions." No error occurred.

### 2. *14 Gang-related Shootings*

We ruled in part I.C.2. above that Chaplin properly relied on the 14 prior gang-related shootings, most of which resulted in homicides, to support his opinion that there was a violent gang rivalry between West Mob and Big Block. This opinion, in turn, supported other opinions Chaplin provided, such as gangs establish their own "exclusive" turf and members of rival gangs who "trespass" on that turf do so for a gang-related purpose. Specifically, Chaplin testified that the corner of Newhall and Newcomb was an area where one "would not ever expect to see somebody from West Mob . . . for any reason other than a gang reason, a shooting or a killing." Cumulatively, these opinions were admissible to establish that appellant possessed the assault weapon for a gang-related purpose, as alleged in the enhancement to count 4. These opinions were all properly admitted. (See pt. I.C., *ante.*) Appellant argues the trial court erred in permitting Chaplin to relate the details of each

of these shootings to the jury because the limited probative value of this evidence was substantially outweighed by its undue prejudice. (Evid. Code, § 352.)

It is noteworthy that appellant admitted his membership in West Mob and never explicitly disputed the existence of gang violence involving West Mob. While objecting to evidence of certain specific acts of violence, appellant not only conceded the widespread gang violence in the Bayview, but relied on it as the cornerstone of his defense from the first lines of his opening statement. Thus we assume, without deciding, that it was error to permit Chaplin to relate the details of all 14 shooting incidents.

In determining whether this error would be reversible, we apply the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*), under which the appellate court must determine if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Williams, supra,* 170 Cal.App.4th at p. 612.) Under *Watson,* we examine the errors made in the context of the entire record to determine if reversal is required. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

The evidence of the 14 prior gang-related shootings was directly relevant to establish the gang purpose alleged in count 4, possession of the assault rifle. Even if the trial court erred in admitting this evidence, under the *Watson* standard we conclude the error was harmless. The primary danger flowing from admission of the other gang-related crimes evidence is its tendency to persuade the jury that the defendant "had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished." (*Albarran, supra,* 149 Cal.App.4th at p. 230; see also *People v. Memory* (2010) 182 Cal.App.4th 835, 859 [105 Cal.Rptr.3d 353].) Such evidence may, therefore, create an emotional bias against the defendant that impacts the jury's determination of all of the charges, not just the gang enhancement. (*Albarran,* at p. 230.) But this danger was much reduced because in this case none of the shootings involved appellant. In addition, it is clear that the "jury's passions were [not] inflamed by the evidence of [the] uncharged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [27 Cal.Rptr.2d 646, 867 P.2d 757].) The prosecutor sought a first degree murder verdict and argued that the evidence established premeditation and deliberation in the shooting of Espinoza. But the jury rejected this and found only murder of the second degree. (Cf. *Williams, supra,* 170 Cal.App.4th at pp. 612–613.) Finally, appellant's trial strategy undermines his claim of prejudice. (See *People v. Jennings* (2010) 50 Cal.4th 616, 653 [114 Cal.Rptr.3d 133, 237 P.3d 474].) Appellant did not dispute the existence of a violent gang rivalry, punctuated by numerous revenge shootings. In fact, as his opening statement made clear, his defense was premised

on it: "To hesitate is to die. To hesitate as a gang member is to die. To hesitate as a gang member on rival turf in the Bayview at night is to die." There were "gunfights beyond sight between West Mob and Big Block." The evidence of the 14 prior gang-related shootings helped provide essential background for *appellant's* claim of self-defense in shooting two strangers who approached him.[26] Without that evidence, the defense would have had no logical basis for its theory of the case.[27]

II.–VIII.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Jones, P. J., and Bruiniers, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 20, 2011, S190431.

---

[26] In his opening brief, appellant argues that the evidence of gang shootings and predicate crimes made it "extremely probable that the jury concluded that [he] . . . acted with a gang intent to kill in counts one through three." But this contention completely ignores the fact that in its opening statement, the defense claimed that because of the endemic gang violence in the Bayview appellant started shooting before he knew whom he was confronting.

[27] Because we do not find multiple errors in the court's rulings on the expert testimony, appellant's request for a cumulative error analysis is moot.

[*]See footnote, *ante*, page 1104.