Filed 11/24/14  P. v. Young CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>LAMARRIEO YOUNG,<br><br>      Defendant and Appellant. | C071355<br><br>(Super. Ct. No. 01F06852) |

Defendant Lamarrieo Young appeals from an order extending his mental health commitment for two years.  He contends the reports and information relied upon and discussed by the prosecution's expert witnesses at trial were in reality testimonial hearsay, and that their admission prejudicially violated his Sixth Amendment confrontation right.  Alternatively, defendant contends that even if the alleged hearsay was properly admitted, no substantial evidence demonstrates he has serious difficulty controlling his dangerous behavior, a required element for extending his commitment.

1

We disagree with defendant's contentions and affirm the order. An expert witness's basis evidence is admissible under California law because it is deemed not to be admitted for the truth of the matter and, consequently, is not testimonial evidence subject to Sixth Amendment analysis. Even if the basis evidence was not admissible, we still could not find prejudicial error because much of the expert witnesses' testimony was based on their personal treatment and observations of defendant. Moreover, sufficient evidence supports the jury's determination that defendant had difficulty controlling his dangerous behavior.

FACTS AND PROCEDURAL HISTORY

The 2012 jury verdict extending defendant's commitment arose from a petition filed on November 7, 2011, by the Sacramento County District Attorney pursuant to Penal Code section 1026.5, subdivision (b).[1] The petition alleged defendant in 2000 was found not guilty by reason of insanity of committing assault with a deadly weapon (§ 245, subd. (a)). He was committed to the State Department of Mental Health (now called the State Department of State Hospitals) on February 28, 2002, under section 1026. That commitment was extended in May 2010 for two years and was set to expire on May 27, 2012.

The district attorney alleged defendant suffered from a mental disease, defect, or disorder, and, as a result of which, represented a substantial danger of physical harm to others. In support of her petition, the district attorney attached an affidavit by Anish Shah, M.D., acting medical director of the Napa State Hospital where defendant was committed, declaring his opinion that defendant qualified for a commitment extension under section 1026.5. Dr. Shah also attached a hospital case summary describing defendant's treatment and behavior during commitment to support his opinion.

---

**1**      Subsequent undesignated references to sections are to the Penal Code.

2

Before us, defendant does not specifically contest the use of hearsay to establish he was originally committed under section 1026, a required element for obtaining a commitment extension. (§ 1026.5, subd. (b)(1).) However, he challenges the admission of all hearsay evidence relied upon by the expert witnesses to reach their opinions.

At trial, defendant moved in limine to exclude all hearsay, and specifically to exclude second-hand information provided to the expert witnesses. He contended admission of such evidence through the experts violated his Sixth Amendment right of confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), and its progeny.

The trial court denied the motion, subject to individual objections. It also deemed the motion a continuing objection.

As its case-in-chief, the prosecution introduced the testimony of two expert witnesses: Philip Cushman, Ph.D., a clinical psychologist at Napa State Hospital, and Dr. Hameed Jahangiri, a staff psychiatrist at Napa State Hospital. The prosecution introduced no other witnesses, and it did not move to admit any exhibits into evidence. Included in the record, however, is a sealed copy of the confidential evaluation prepared for the trial court and signed by both expert witnesses.

Both experts testified that, in their opinions, defendant suffered from a mental disease, specifically schizoaffective disorder, along with antisocial personality disorder and controlled substance abuse. Both experts believed defendant, as a result of his mental disease, had difficulty controlling his dangerous behavior and would be a danger to others outside the hospital setting.

To reach their opinions, the experts relied upon their personal observations from treating defendant along with information provided to them from other hospital staff members and in various reports, including the hospital case summary that was attached to the petition.

*Dr. Cushman's testimony*

Asked to explain defendant's underlying offense, Dr. Cushman stated defendant went into a store and asked a clerk where the flour was. While the clerk went to show defendant, he stabbed the clerk six times in his neck and shoulders. Defendant left the store without taking any items. Prior to the incident, defendant had been hospitalized twice in a psychiatric hospital and prescribed antipsychotic medication. He had not been taking his medication for some time at the time of the offense. He lived in an agitated state at that time, isolating himself in his room, yelling at nonexistent people, repetitively rubbing his hands to the point they became raw, and repeatedly pounding on his chest. His thoughts were disorganized, and he believed people were out to get him.

Defendant was placed in an involuntary psychiatric hold after committing the crime. He tested positive to THC, the active ingredient in marijuana. Medical staff believed defendant was hearing voices based on his outward behavior of moving his lips as if speaking to someone and chuckling to himself. Defendant, however, denied hearing voices.

After being found not guilty by reason of insanity, defendant was first committed to Atascadero State Hospital, and was transferred to Napa State Hospital in 2002. Dr. Cushman described Napa State Hospital as a minimum security forensic facility. Unlike in a traditional hospital, where the patient is the client, at a forensic facility, the court is the hospital's client. Individuals are placed into psychiatric treatment there by order of the court. The hospital's mission is, first, to keep the people committed there out of society, and, second, to treat and help them to be able to reenter society.

Reentry is achieved through a progressive series of treatment programs. A new patient may begin treatment subject to having two escorts with him at all times. Over time, if he follows his treatment regimen and his behavior improves, he may advance to having no staff escort him and being placed in an open or unlocked residential unit.

From there, a successful patient may qualify for a conditional release program, commonly referred to as CONREP, where he is reintroduced to the community.

Each patient is assigned a treatment team that includes a psychiatrist, a psychologist, a social worker, a rehabilitation therapist, and nursing staff. This team designs a treatment program and then monitors the patient's compliance and progress. The members of the treatment team personally observe the patient in the group and individual treatment programs they provide and the nursing services they render.

At the beginning of each work day, Dr. Cushman receives a nursing report on the patient's behavior for the past 24 hours. All nursing and nonphysician staff members record their observations in the patient's chart. These notes are called interdisciplinary notes, or IDN's.

The treatment team meets in a monthly treatment planning meeting to monitor the patient's progress and make any necessary changes to the treatment program. Reports of those meetings are also prepared.

By law, the hospital must also submit to the court a report on the patient's status and progress every six months. (§ 1026, subd. (f).) The psychologist on the treatment team has traditionally been responsible for preparing the six-month report.

When a patient completes the time of his sentence, and if the treatment team believes he remains a danger to society, the team engages in a commitment extension evaluation in order to recommend whether the patient's commitment should be extended under section 1026.5. If this is to be the patient's first extension, staff members review his progress since his initial commitment. If the patient is there on an extended commitment, the staff reviews his progress since the last commitment extension.

To perform the commitment extension evaluation, the treatment team members provide their input on their observations of the patient in one of the team meetings, and they decide whether to recommend the commitment be extended. The treating psychologist or psychiatrist prepares the formal report documenting the team's decision.

5

The author relies on the six-month reports provided by the hospital to the court and the monthly conference reports, and the author's own monthly progress reports, to write the formal recommendation.

Dr. Cushman was involved in the commitment extension evaluation for defendant. He considered himself the person at the hospital most familiar with defendant. From 2002, when defendant arrived at the hospital, until about 2005 or 2006, Dr. Cushman was the psychologist assigned to the unit where defendant resided. Dr. Cushman was not on defendant's treatment team at that time, but defendant participated in some groups run by Dr. Cushman, and Dr. Cushman was familiar with defendant's case.

From 2005 or 2006 until 2007, Dr. Cushman and defendant were together in a different unit, and Dr. Cushman was on defendant's treatment team as defendant's psychologist. In 2007, defendant was transferred to a different unit. He remained there until May 2010, when, after having his original commitment extended, he was transferred back to Dr. Cushman's unit and treatment team, where he remained through the time of trial.

Dr. Cushman testified defendant had a major mental illness known as schizoaffective disorder. He also suffered from antisocial personality disorder. He had originally been diagnosed with schizophrenia. A person with schizophrenia hears voices and can be paranoid or delusional. They may be unable to express themselves due to disorganized thinking. They also may exhibit disorganized behavior or ritualistic movements such as rubbing their hands or beating their chests. These behaviors take place over a period of many months.

In 2010, defendant was diagnosed with schizoaffective disorder instead of schizophrenia. Schizoaffective disorder is an illness that causes the same symptoms and behaviors as schizophrenia, but it also causes mood disturbances, such as mania. The patient becomes hyperverbal, speaking and changing topics quickly. Along with mania,

6

the disease results in an activated behavior level, with the patient seeking to be involved with more sexual activities, high risk theft, or even aggression against other people.

Defendant's change in diagnosis from schizophrenia to schizoaffective disorder followed a period of seven or eight months when defendant had been taken off all of his antipsychotic medications. In 2010, defendant thought he no longer had a mental illness and could successfully end his medications. Dr. Cushman and the psychiatrist thought it worth a try to see if defendant could in fact live successfully without his medications, knowing it would be done in the supervised environment of the hospital.

For the first four months after medication was removed, defendant had several "incidents." One was in June 2010, when he was in a fight with male patients from another unit. He suffered a swollen left eye and a split lip. In August, he yelled and cursed at staff.

But then the incidents began to increase. In November 2010, defendant was found in possession of methamphetamine. In the same month, he rubbed his hands across a female staff member's buttocks and asked, "Can I do that again, touch your butt?" In December 2010, he refused orders to move away from a doorway to an adjoining dining hall where he was trying to make contact with other patients.

The number of incidents increased such that from February to March 2011, he had about ten or 11 incidents. In early February, defendant started exhibiting early signs of schizophrenia. He had an argument with a male patient, and was administered medication in order to calm him down. He challenged another male patient to a fight. He asked inappropriate personal questions of female staff members. He began missing a lot of sleep and became more hyperactive during the day. His sleeplessness became so bad that his roommates began to complain, and the nursing staff had him stay in a different side room at night.

At the same time, defendant's behavior became more psychotic. He walked in a manner referred to as a "monkey walk," where he would walk the hallways making

7

bizarre gesturing. He also became more aggressive and wanted to fight his roommates. He would be seen mumbling to himself more often, but he would deny he was hearing voices.

Other incidents occurred. He had a verbal altercation with a difficult female resident who started calling him names. Staff advised him to back down, but he started "getting into it," responding with some kind of gesture. Believing the interaction would turn physical, staff members had to separate him from the female. Defendant turned to walk away, but as he did, he brushed up against the shoulder of the staff member who was holding back the female patient.[2] Although the report on this incident stated the contact was accidental, Dr. Cushman believed defendant was sending a message by bumping into the staff member: do not mess with me.

Defendant was seen standing in front of a vending machine, talking with himself, and struggling to make a decision about what he was going to purchase. He spoke of how much more confused he had been since he had been off his medication.

In March 2011, defendant was in the same room as a female staff member and a female patient. Defendant was sitting down with his feet up on a chair. He started holding his genital area and rubbing it while looking at the female patient. The staff member told him that was inappropriate. In response, defendant stood up, kicked the chair, told the staff member, "Shit, mind your own thing," and slammed the door as he left the room. The next day, a staff member found defendant in the men's bathroom with the same female patient. He was crawling under the stall wall to avoid being detected in the same stall with her.

_____

[2] Defendant objected to Dr. Cushman's testimony about this verbal altercation as hearsay, as Dr. Cushman read portions of a report not submitted into evidence as part of his testimony. The trial court overruled the objection and instructed the jury that the evidence was being offered only to show the basis for Dr. Cushman's opinion, not for the truth of the matter stated.

Defendant also broke rules in a way that was consistent with his antisocial personality disorder. He was caught smoking in a restricted area, even though all tobacco was banned in the hospital. On another occasion, he rode his bike on the grounds when he should have been in a group session. On another occasion he was seen talking with another patient through a window in another unit. Staff members, investigating the incident, found two small holes that had been drilled into the window casing through which material could be passed.

Other rule violations occurred. Defendant was found with cash that had been placed in a magazine sent to him, in violation of hospital rules, after defendant had said there was nothing inside the magazine. In April 2011, he was caught trying to transfer two rolled-up papers with cigarettes and quarters to someone in another dining hall. To do this, he had three peers cause a diversion to attract the nursing staff, and he told one of the food workers not to say anything.

He was given the privilege of holding an inmate job. During three months of employment, defendant worked only one day. When asked why he did not attend his job, defendant blamed the staff for granting him access to the hospital grounds.

Defendant also had a history of using controlled substances. In addition to testing positive when he was involuntarily committed after committing the offense, he tested positive for THC while at Napa State Hospital in 2003, 2005, 2008, and 2009, and for cocaine in 2006 and 2007. In 2010, he alluded to the psychiatrist that he was using methamphetamine. Two or three weeks later, he was caught with it. When tested, defendant attempted on occasion to use other persons' urine or an older, clean sample of his own urine. He also appeared to be a runner for a known contraband and drug dealer in the hospital.

Dr. Cushman interviewed defendant and was surprised at the change in his behavior. Dr. Cushman had interviewed defendant 10 years prior and, at that time, even though defendant was not then stabilized on his medication, he did not exhibit the level of

9

hyperactivity, verbosity, and disorganized speech he now did. These were symptoms one did not regularly see with schizophrenia, but were more consistent with schizoaffective disorder. These symptoms were also combined with the warning signs of schizophrenia: the changes in sleep patterns and the aggression towards others. Left unchecked by medication, the disease would progress to paranoia, delusional thinking, and, in some people, aggressiveness against others. Dr. Cushman believed defendant was one of those persons who, when he became psychotic, would become aggressive. Defendant had difficulty following the rules and had never progressed in his treatment enough to be allowed to live in an open unit.

As a result of observing these changes in defendant's behavior, his treatment team determined in March 2011 to place him back on his medications. In Dr. Cushman's opinion, defendant can control his immediate behavior when he is on medication. But when he is off his medication, he becomes more impulsive and driven by the schizophrenia and the mood disorder. Dr. Cushman acknowledged that much of defendant's acting out over the years occurred while he was on medication, and Dr. Cushman believed the majority of those incidents occurred due to his antisocial personality disorder or substance abuse instead of any psychosis. He agreed that when defendant is medicated, he still may misbehave, but that when he is not medicated, his condition worsens and he is driven more by schizophrenia.

Defendant did not demonstrate an accurate understanding of his underlying offense, as he changed his statements about it over the years. Relying on various reports, Dr. Cushman noted that after defendant had been committed to Atascadero State Hospital, he was quoted in 2002 as saying, " 'I get delusional. I think something is there and it really isn't. And I can hear voices and they make me react.' [¶] . . . [¶] 'I was

10

really psychotic and paranoid at the time and thought the clerk was going to hurt me, so we got into an altercation.' "[3]

In a 2009 report prepared for the first commitment extension, defendant denied he was mentally ill and called the offense an altercation. He was quoted in a 2009 report as saying the voices told him to take a knife with him to the store.

In a 2011 interview with Dr. Cushman, defendant said the incident was " 'drug related. Cocaine. I used that morning. I did drugs. I felt I wasn't safe. I assaulted him, the store clerk. I bought something. Paid for it. I did it [the stabbing].' " The underlying offense was part of the reason Dr. Cushman believed defendant was the type of schizophrenic who could be aggressive and violent.

Dr. Cushman stated defendant had very poor insight into his medical illness and need for medication. Over the years, defendant had regularly asked the psychiatrist to lower or eliminate his medications, indicating he did not believe he needed medication. Dr. Cushman believed defendant would not take his medications if he was not supervised in a structured environment. At Napa State Hospital, defendant is monitored to make sure he takes his medications.

Dr. Cushman believed defendant's use of controlled substances increased his potential for becoming dangerous. Defendant's drug use is a serious problem, as controlled substances significantly and negatively interact with antipsychotic medications. Dr. Cushman stated using drugs with medications exacerbates the mental illness and causes the patient to decompensate, or get worse in their psychotic processing.

---

**3** Defendant objected to the statements from the Atascadero report as multiple hearsay, but the court overruled the objection to the extent Dr. Cushman was relying on the report as a basis for his opinion. The court also acknowledged defendant had a continuing objection.

He described it as "throwing gasoline on a fire in regards to driving the paranoia that you oftentimes see with schizophrenia."

In Dr. Cushman's opinion, defendant, as a result of his schizoaffective disorder and antisocial personality disorder, has serious difficulty controlling his dangerous behavior and would be a substantial danger to others outside the hospital setting. This was particularly true when defendant was not taking his medications, and Dr. Cushman believed defendant could not be relied upon to take his medications as prescribed. Defendant's use of street drugs would only hasten the process of becoming psychotic and dangerous.

On cross-examination, Dr. Cushman acknowledged the notes and reports he relied upon for his testimony in court were written in part by staff members and were written in part for him to use while testifying in court.

*Dr. Jahangiri's testimony*

Dr. Jahangiri's testimony was consistent with Dr. Cushman's testimony. Dr. Jahangiri was the leader of defendant's treatment team and defendant's psychiatrist from April or May of 2010 until August 2011. That team evaluated defendant for this commitment extension. To do so, the team drew from their personal experiences with defendant as well as his recorded history.

Based on his review of defendant's medical records, Dr. Jahangiri understood that defendant had been diagnosed with schizophrenia before he committed the underlying offense. He had also been prescribed medication, but was not taking it at the time of the offense. Defendant exhibited impulsive behavior that was not rational or logical at that time. He felt scared the store clerk might hurt him, so he attacked him. Dr. Jahangiri believed defendant's mental disorder could manifest in violence, especially when he was not medicated.

12

Dr. Jahangiri stated defendant's insight into his disease and his need for medication changed over time. At some times, he understood he needed to take medication; at other times, he believed he did not need medication.

Dr. Jahangiri was the psychiatrist who authorized taking defendant off his medications in 2010. One reason he did so was to learn whether the medications were causing defendant to have a low white blood cell count. Dr. Jahangiri wanted to see if defendant's bone marrow could be regained if he was not taking the medication on a daily basis. He allowed defendant to receive medication as needed.

During the time defendant was not on his medication, his functioning changed. He became overly jocular with staff and peers, making odd remarks and laughing inappropriately. When he walked, he would make odd gestures like flailing his arms in various directions and touching or smacking people. Dr. Jahangiri said this type of activity was tied to a manic increase in mood. The behavior was also dangerous in the hospital environment, as it could trigger assaults from the patients. Defendant also lost logical coherence in his thought processes.

Dr. Jahangiri knew of defendant's inappropriate behavior. Defendant touched a female staff member's buttocks and asked if he could do it again. He stripped off his clothes in a hallway. He traded in contraband and was found with methamphetamine on one occasion and smoking a cigarette on another.

Defendant appeared at times to be responding to certain internal stimuli, such as voices, and then mumbling as if he was in a conversation with an unseen person. Also during the same time, he became more aggressive.

By March 2011, Dr. Jahangiri concluded defendant's behavior was the result of his mental illness, and so he started defendant back on his medication. Dr. Jahangiri met with defendant once or twice a week, and it became apparent defendant could not control his schizoaffective symptoms. Also, by that time, neurologists eliminated a neurological

cause for defendant's behaviors. Dr. Jahangiri concluded medications were necessary to control defendant's symptoms.

As with Dr. Cushman, Dr. Jahangiri testified defendant's use of controlled substances and street drugs would only exacerbate his mental illness and could negate the effects of medication.

Dr. Jahangiri stated defendant suffered from schizoaffective disorder, antisocial personality disorder, and controlled substance abuse. He also believed, as a result of those mental disorders, defendant had a propensity to be violent and had difficulty controlling his dangerous behavior unless his illnesses were properly managed. He believed, as a result of his illnesses, defendant posed a substantial danger to others.

On cross-examination, Dr. Jahangiri acknowledged the existence of a transfer report, authored by another doctor, that stated defendant was low-risk for aggression and running away. On redirect, Dr. Jahangiri explained the report's author was not on defendant's treatment team, and, at the time the report was written, defendant was taking antipsychotic medication on a regular basis.

DISCUSSION

I

*Admission of Experts' Basis Evidence*

Defendant contends the trial court erred by allowing the expert witnesses to describe the reports and notes they relied upon in reaching their opinions. He asserts the witnesses' descriptions of the reports and notes were inadmissible hearsay because they were of necessity used here by the jury to establish the truth of the reported matters in order to evaluate the expert opinions. He also claims admitting the descriptions violated his Sixth Amendment right of confrontation, as the descriptions were allegedly testimonial statements admitted for the truth of the matter. We disagree with both of his contentions under the current state of California law.

14

Expert testimony may be "premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. (Evid. Code, § 801, subd. (b); [citations].) . . . [¶] So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.] And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618, original italics (*Gardeley*).)

As the trial court ruled, the reports and notes the experts relied upon were not admitted for the truth of the matters stated, but rather only to help the jury evaluate the experts' opinions. As such, they were not inadmissible hearsay under California law.

In addition, admission of the evidence did not violate defendant's right of confrontation. Assuming only for purposes of argument that the statements were testimonial in nature, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Crawford, supra*, 541 U.S. at p. 60, fn. 9.)

Defendant contends we may follow a contrary argument developed, but not applied, by the First Appellate District in *People v. Hill* (2011) 191 Cal.App.4th 1104 (*Hill*). Justice Simons, with Presiding Justice Jones and Justice Bruiniers concurring, agreed with the analysis by New York's highest court in *People v. Goldstein* (2005) 6 N.Y.3d 119, and stated "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Hill, supra*, 191 Cal.App.4th at p. 1131, fn. omitted.) In such circumstances, the *Hill* court believed the statements are actually

15

offered for their truth, and are thus both inadmissible hearsay and subject to Sixth Amendment analysis. (*Id*. at pp. 1131-1137.)

However, even the *Hill* court, despite its persuasive critique, recognized it was obligated to follow *Gardeley*, and it did so. (*Hill, supra*, 191 Cal.App.4th at p. 1131.) We are under the same obligation (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 45, 455), and we reach the same result.

Moreover, this case may not be the vehicle for defendant to pursue his theory. Both experts testified to basing their opinions in part on their significant personal observation and experience with defendant. Dr. Cushman was the person at Napa State Hospital most familiar with defendant. Indeed, since defendant's last commitment extension, Dr. Cushman has been defendant's treating psychologist. He personally observed many of the changes in defendant's behavior after medication was removed. Similarly, Dr. Jahangiri had been defendant's treating psychiatrist, and was the physician who took defendant off his medication, personally observed some of the resulting behaviors, and put him back on medication. Dr. Jahangiri interviewed defendant as often as two times a week during this period. Because both experts relied to a significant extent on their own personal observations and experience, much of their testimony was not hearsay and was properly admitted. Moreover, it is difficult to determine from the record in many instances when the experts were relying on previously prepared reports. Because the experts personally observed defendant's difficulty in controlling his behavior, we could not say admitting the portions of their basis evidence that allegedly was hearsay and testimonial resulted in prejudicial constitutional error.

We conclude the trial court did not err in allowing the experts to describe the reports and notes on which they based their opinions.

16

II

*Sufficiency of the Evidence*

Defendant contends sufficient evidence does not support his commitment extension. He specifically claims the evidence does not show he has a serious difficulty controlling his dangerous behavior. We disagree.

A defendant's commitment can be extended only if "by reason of a mental disease, defect, or disorder [the defendant] represents a substantial danger of physical harm to others" (§ 1026.5, subd. (b)(1)), and the defendant has "serious difficulty in controlling dangerous behavior." (*People v. Galindo* (2006) 142 Cal.App.4th 531, 533, following *In re Howard N.* (2005) 35 Cal.4th 117, 132.) The additional element of difficulty in controlling dangerous behavior serves "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." (*Id*. at p. 128.) "[A] prediction of future dangerousness, coupled with evidence of lack of volitional control, adequately distinguishes between persons who are subject to civil commitment and ' "other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." ' [Citation.]" (*People v. Galindo, supra,* 142 Cal.App.4th at p. 537.)

" ' "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.]" (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878-879.)

Our review of the entire record reveals sufficient evidence upon which the jury could determine defendant had serious difficulty controlling his dangerous behavior. The evidence demonstrated defendant could not control his behavior when he was off his medication, and that he could not be trusted to take his medication consistently. Indeed,

the experiment of taking defendant off his medication was based in part on his claim that he could live safely without it. He was thus given the opportunity to control his behavior without medication, and he could not do it.

His behavior during that time was potentially dangerous. He engaged in verbal and physical altercations, and even challenged his peers to fight him. Even when separated from a verbal confrontation he did not initiate, he could not resist a final attempt to send a threat by bumping into the staff member who was restraining the antagonist. He also engaged in sexually inappropriate behavior.

He could not control his illicit drug use during this time. And the experts were clear that using street drugs quickly exacerbated the schizoaffective disorder and its effects, potentially rendering defendant even more dangerous and unable to control his behavior.

In addition, defendant's insight into his disease was not consistent. Despite the disease being chronic, defendant continued to believe at times he did not require medication to remain stable.

The evidence amply supports both expert witnesses' conclusions that defendant had serious difficulty controlling his dangerous behavior and would continue to do so if he was released from commitment.

Defendant contends the evidence is insufficient in part because neither expert prepared a formal risk assessment; in fact, the only such assessment in the record described defendant as low-risk for aggression and running away. However, the author of that report was not on defendant's treatment team, and at the time it was authored, defendant was taking his medication on a regular basis. This report thus had little effect on the sufficiency of the evidence indicating defendant could not control his dangerous behavior.

DISPOSITION

The judgment is affirmed.

<u>     NICHOLSON     </u>, J.

We concur:

<u>     BLEASE     </u>, Acting P. J.

<u>     HULL     </u>, J.