Filed 2/4/15  P. v. Greenberg CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071462 |
| v. | (Super. Ct. No. P08CRF0316) |
| MORRIS ANTHONY GREENBERG, | |
| Defendant and Appellant. | |

Defendant Morris Anthony Greenberg, a former police officer, shot and killed a man dating his estranged wife.  Moments later, he shot himself under the chin in an apparent suicide attempt.  A jury found him guilty of first degree murder and found true certain firearm enhancement allegations.  The trial court sentenced him to 50 years to life

1

in prison and ordered him to pay various fines, fees and surcharges, including part of the cost of his legal defense.

Defendant now contends (1) the trial court erred in barring testimony from two expert witnesses, one who would have testified about suicide ideation among police officers and another who would have testified about firearms training for police officers; (2) in determining defendant's ability to pay certain fees, the trial court impermissibly considered his public employee disability retirement pay; (3) the trial court improperly ordered defendant to pay restitution with cash seized from his apartment, because there was no evidence that he had any income other than disability retirement; and (4) a $10,000 "general fund fine" was unauthorized.

We conclude (1) the trial court did not abuse its discretion in barring the expert witness testimony; (2) there is substantial evidence to support a finding that defendant had the ability to pay the fees; (3) defendant did not establish that the cash seized from his apartment came from exempt funds; and (4) we will strike the $10,000 general fund fine. Our review also identified a clerical error in the abstract of judgment.

We will modify the judgment, affirm the judgment as modified, and order the trial court to prepare an amended and corrected abstract of judgment.

BACKGROUND

Defendant began employment as a police officer in 1996. He married the following year, the couple had a daughter two years later, and they bought a home in El Dorado County in 2006. Defendant went on disability retirement in 2007 due to neck injuries.

By July of 2008, the family home was in foreclosure and listed for sale. The couple separated in May and defendant's wife began dating the victim. Defendant testified that he went to the shop where the victim worked and told him to stop seeing his wife because he wanted to work on the marriage. Defendant also warned his wife to stop

2

seeing the victim, threatening that if she did not, she would be sorry for the rest of her life.

Over the summer the couple moved items from the home to their separate residences. One morning a friend helped defendant move a trailer away from the house; defendant's wife said she would be moving items with friends that day and defendant did not want her using the trailer. Defendant had breakfast with his daughter, took some things from the house to his apartment, and then returned to the house.

When defendant arrived at the house at about 1:40 p.m., his wife was there with the victim and the victim's sister and brother-in-law. Defendant was angry that they had loaded a refrigerator and other items onto a trailer parked in front of the house. Defendant saw the victim apparently disassembling a roof in the horse corral area and told him, "[G]et the fuck off the property." Defendant then walked into the house, used the "command presence" he had learned as a police officer, and insisted that the others "get the fuck out of the house." His wife protested that she needed help to move her things, but the visitors went outside and prepared to leave as defendant directed.

As the victim's sister walked outside, she saw the victim walk from the horse corral toward the passenger side of her truck. There were no firearms in the truck and the victim was not carrying a gun. The victim's brother-in-law began to get into the driver's seat of the truck beside the victim, but he remembered his tools and returned to the house to fetch them. At the same time, an argument between defendant and his wife escalated and the wife asked the victim's sister to walk their daughter back into the house. The child was crying and saying she "didn't want daddy to do this," and "didn't want anybody to go to jail." The victim was quietly sitting in his sister's truck. Defendant angrily repeated his order for the victim to leave; the victim said he was just waiting for his brother-in-law.

As defendant and his wife stood near the trailer attached to her truck, he accused her of taking the property in the trailer without his permission and threatened to call the

3

sheriff; his wife replied, "[G]o ahead and do it." She asked him, "Why do you have to make this so ugly?" Striding toward his parked Mercedes, defendant said he would show her ugly. Defendant's car was parked about 100 feet from the house. When he got to the car, he reached into the passenger side, bending toward the dashboard. The victim's brother-in-law testified that less than a minute passed from when he heard the wife telling defendant to go ahead and call the sheriff until he heard the sound of gunfire.

Defendant said his gun was already in his waistband; he said he retrieved a cell phone from his car but could not get a signal. When defendant returned from his car, his wife had walked from the trailer to where the victim was sitting. She said defendant had his hand down and his arm behind his leg as he approached. He stepped between her and the victim inside the open truck door, lifted his arm and shot the victim twice in the chest. His wife dropped to the ground begging not to be hurt. Defendant stepped back and shot the victim in the head. The victim died from multiple gunshot wounds.

Defendant claimed self-defense, imperfect self-defense and/or sudden argument or heat of passion. Although the victim was wearing shorts and a tank top and defendant observed him walking to the truck with nothing in his hands and no bulge from a concealed weapon, defendant said he knew the victim sometimes carried a concealed weapon. Defendant claimed that when he was two or three feet away and inside the open truck door, he saw the victim reach under the seat and retrieve a black gun. Defendant pulled his gun from his waistband and started firing. He said he was scared and twice warned the victim to show his hands. When he looked for a gun as the victim slumped down on his left side, there was no gun.

Defendant then shot himself. His wife ran into the house, grabbed her daughter, and fled out the back door to call 911 from a neighbor's house.

A jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a) -- count I) and found true various firearm enhancement allegations (Pen. Code, §§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d)). The trial court sentenced him to 25 years to life

4

in prison for murder and 25 years to life for one of the firearm enhancements, staying sentence on the other enhancements. The trial court also awarded 1,406 days of presentence credit and ordered defendant to pay various fines and fees, but scheduled another hearing to discuss restitution, defendant's income, and his responsibility for additional costs.

At the subsequent hearing, the trial court ordered defendant to pay restitution to various individuals and to reimburse the California Victim Compensation and Government Claims Board. In addition, over defendant's objection, the trial court ordered that $7,000 in cash seized from defendant's apartment be applied toward restitution.

The trial court also ordered defendant to repay part of the cost of his legal defense. Defendant objected that his disability retirement benefits are exempt and shielded under Code of Civil Procedure section 704.110. The trial court concluded: "[I]f there is a shield, the law is what the law is, but I'm going to assess those amounts and make a finding that you have the ability to pay those sums out of your retirement and out of your prison earnings."

Additional facts are set forth in the discussion as relevant to the contentions on appeal.

DISCUSSION

I

Defendant contends the trial court erred in barring testimony from two expert witnesses, one who would have testified about suicide ideation among police officers and another who would have testified about firearms training for police officers.

A

We begin with the expert psychologist who would have testified regarding suicidal ideation among police officers. Defendant wanted to offer the testimony to negate a conclusion that his attempted suicide evidenced consciousness of guilt. The prosecutor

5

suggested in closing that defendant's suicide attempt may have been fueled by guilt. Defendant claims the psychologist would have corroborated defendant's testimony that he tried to commit suicide not because of guilt but because of a sense of moral responsibility and because of other stressors.

The prosecution moved in limine to exclude the psychologist's testimony because the psychologist's expertise involved evaluating police officers for fitness following onduty shootings. The trial court subsequently held a hearing without the jury to evaluate the proposed testimony. (Evid. Code, § 402.) The psychologist would have testified that a person can become suicidal after shooting someone, not necessarily as an acknowledgment of wrongdoing but from a feeling that they had responsibility or might have done something to prevent the tragedy. The psychologist admitted he would be speculating about attempted suicide by former police officers and he had not evaluated defendant.

The trial court noted defendant did not shoot anyone in the line of duty and the expert did not claim special knowledge about shootings by former officers or by persons engaged in domestic disputes. The trial court excluded the expert testimony as not relevant and potentially confusing to the jury.

To be admissible, expert opinion testimony must assist the trier of fact because of its relationship to a subject "beyond common experience." (Evid. Code, § 801, subd. (a).) Under this rule, a "trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.) An expert opinion is also properly excluded if the trial court finds " 'too great an analytical gap' " between the anticipated opinion and the data on which the opinion is based. (*Id*. at p. 771 [applying Evid. Code, § 802].) On appeal, a trial court's decision to admit or not to admit expert testimony is reviewed for abuse of discretion, that is, for proof that the trial court's discretion was exercised in an arbitrary,

6

capricious or patently absurd manner that caused a manifest miscarriage of justice. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1122.)

The psychologist in this case agreed "there can be a number of reasons" why someone might try to kill himself after shooting someone else. Stating "once an officer always an officer," the psychologist said he was familiar with the physical effect of adrenaline on officers who enter a situation anticipating the need for deadly force and how that affects their psychology. But he added, "[I]t's really hard. I would just be speculating in terms of how someone who was no longer in law enforcement would react in that situation."

The psychologist did not evaluate defendant and had no means to directly corroborate defendant's testimony. Moreover, the psychologist demonstrated no knowledge or expertise outside the context of returning officers to duty after on-the-job violence. The trial court said the difference between defendant's circumstances and the circumstances in which the witness had expertise were "fundamental" and concluded that the expert "had nothing to provide to the jury that they couldn't already do with their common sense." The trial court appropriately evaluated the evidence and the arguments of counsel and reached a decision that was well within the scope of its discretion. (See *People v. Hill, supra,* 191 Cal.App.4th at p. 1122 [setting out discretionary standard and burden of proof].)

Contrary to defendant's argument, excluding the evidence did not deprive him of the ability to present a complete defense. Defendant testified at length about his response to the shooting, saying it was "absolutely horrible" and "extremely traumatic" to have been "forced to shoot someone," calling it the most difficult thing he had been through in his life and the "straw that broke the camel[']s back" following a difficult three-year period where "everything had just come crashing down." In closing, his lawyer argued that people commit suicide for a variety of reasons, including accidents, and emphasized that this was the "[f]irst time [defendant] ever had to shoot somebody." Defendant's

7

explanation for his suicide attempt was presented to the jury even without the expert opinion. There was no constitutional violation. (See *Crane v. Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636] [defining scope of constitutional right to present a defense].)

Defendant cites *People v. Carter* (1957) 48 Cal.2d 737 for the proposition that testimony corroborating a defense is not cumulative. But here the trial court did not exclude the expert testimony because it was cumulative; it excluded the testimony because it was irrelevant and potentially confusing. *Carter* does not assist defendant.

B

We turn next to the witness who served as a "range master" and who would have testified about firearms training for police officers. According to defendant, the range master could have described defendant's training and experience as a police officer, thereby corroborating defendant's testimony that a "combat-like" situation caused defendant to shoot the victim in self-defense. Defendant claims that without the training testimony he was unable to present a complete defense, in violation of his constitutional rights.

The range master described himself as a former neighbor and close friend of defendant's. He testified that he has been employed for almost 29 years as a police officer, serving as a firearms instructor, a Special Weapons and Tactics (SWAT) team leader and a sniper, among other things. He described defendant as extremely honest, a talented police officer who conducted himself as a professional both on duty and off duty, and a man who was not violent, but was logical, cautious and deliberate. He said he last saw defendant about five years before trial (which was two years before the crime).

Defendant wanted the range master to explain that police officers are trained to maintain self-control in hostile situations. Defendant believed such testimony would help the jury determine whether his response to a perceived threat from the victim was reasonable. The trial court said expert evidence could not transform the "reasonable person" standard for self-defense to a "reasonable retired [police] officer" standard.

8

Nonetheless, the trial court allowed defendant to describe his own training and experience at length and to explain why he thought he was defending himself. But the trial court ruled that corroboration by the range master would involve undue consumption of time and was not relevant because defendant was not acting as a police officer when he shot the victim.

Revisiting the expert testimony issue when defendant raised it a second time, the trial court observed that the reasonableness of defendant's subjective belief that he needed to defend himself was within the province of the jury. When defendant raised the issue yet again in a motion for new trial, the trial court distinguished onduty shootings from "personal situation[s]" and stated that the testimony of the firearms expert could have led to confusion. Nonetheless, to address defendant's concerns, the trial court had ruled that defendant could testify about his firearms training, and the expert testimony could come in on rebuttal if the prosecutor attacked defendant's credibility as to what he had been trained to observe; if the rebuttal testimony came in, the trial court had warned, it would be limited to the "very narrow issue" of defendant's actual belief about what he saw before he shot the victim. The trial court had instructed the jury with CALCRIM No. 571, informing them that the jury could find "defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Defendant claims he had the right to offer the expert testimony in rebuttal because the prosecutor questioned him on cross-examination about how angry he was when his commands were not obeyed in the manner expected by a police officer. On direct examination, defense counsel asked about defendant's failure to follow police training by

finding and securing the gun he allegedly saw in the victim's hands.[1]  During cross-examination, the prosecutor inquired about defendant's failure to offer medical aid to the wounded man, and about how well he could hear after the shooting.  Defendant subsequently argued the questions about his hearing "opened the door" for expert testimony to explain what happens in "combat-shooting situation[s]."  The trial court ruled that combat-shooting testimony would not be relevant and would cause an undue consumption of the jury's time.

Defendant argues the expert's testimony would have gone "directly to the issue of whether appellant committed a cold-blooded killing, as theorized by the People, or whether defendant acted in the actual, and reasonable, or actual, but unreasonable, belief in the necessity to defend himself."  In support, he cites *People v. Humphrey* (1996) 13 Cal.4th 1073, a case where the defense relied on battered woman syndrome (BWS).  BWS is the subject of a unique rule of evidence that explicitly makes expert testimony on that syndrome admissible if it is relevant.  (*Humphrey, supra,* 13 Cal.4th at p. 1087, citing Evid. Code, § 1107.)  Expert testimony on BWS is relevant to counter stereotyped impressions about women who remain in abusive relationships such as the " 'common sense' " conclusion that a woman would have fled if the situation was bad.  (*Humphrey, supra,* 13 Cal.4th at pp. 1086-1087.)  The holding in *Humphrey* was limited to Evidence Code section 1107.  (*Id*. at p. 1087.)  It did not create a broad, general right to rehabilitate credibility with expert testimony any time a defendant asserts self-defense.

Defendant also cites *People v. Minifie* (1996) 13 Cal.4th 1055, for the proposition that a defendant is " ' "entitled to corroborate his testimony that he was in fear for his life

---

[1]  Defendant responded to these questions by saying that he failed to look for a gun after the shooting because he saw no gun and because he would have done that "in the role as a police officer . . . [b]ut this is kind of different" and, if he had been acting as an officer, "[i]t would never have gotten to a shooting."

by proving the reasonableness of such fear." ' " (*Id*. at p. 1065.) *Minifie* held that threats against a defendant by third parties related to the victim could be considered by a jury to evaluate whether a defendant's use of force was reasonable. (*Id.* at p. 1069.) The trial court in that case had improperly excluded evidence that the defendant's friend had recently been killed by members of the victim's "crowd," that the crowd had threatened that the defendant would be " ' "next," ' " and that the crowd had a reputation for violence. (*Id*. at p. 1067.) *Minifie* is inapposite; in contrast to that case, defendant here was allowed to explain in great detail why he thought he was in imminent danger and nothing about the excluded testimony promised to shed more light on the actual dynamics between the victim and the defendant or on the shooting itself.

Defendant's request to have the jury hear about combat situations from the range master was properly denied. The only "combat" was a verbal exchange between defendant and his wife over kitchen appliances. It is common knowledge that police officers are trained to use firearms appropriately, but defendant had not been employed as a police officer for quite some time and he was not on duty when he shot the victim. There is no recognized syndrome here that might in some way parallel battered woman syndrome, rape trauma syndrome or child abuse accommodation syndrome, but even in those cases, expert testimony is admissible only to counter specific common myths or misperceptions about a victim's behavior. (See *People v. Humphrey*, *supra,* 13 Cal.4th at p. 1087 [expert role in correcting stereotyped misconceptions of battered women]; *People v. Wells* (2004) 118 Cal.App.4th 179, 188-190 [same for victims of sexual trauma and abuse].) Jurors are presumed to be equipped to judge witness credibility without the aid of expert opinions. (*Wells, supra,* 118 Cal.App.4th at p. 189.)

At best, the range master would have said that police officers are taught to recognize and react to threats, but the critical issue for the jury was not whether defendant knew or followed police protocol but whether he had an actual belief that he was threatened at the moment he fatally shot an unarmed man. The issue, in other words, was

his credibility. The range master already had testified in glowing terms about defendant's character and credibility. The prosecutor's cross-examination did not challenge defendant's training or ability to recognize or respond to combat situations, so the right to present rebuttal evidence was never triggered. The trial court did not abuse its discretion in limiting additional testimony. (See *People v. Hill, supra,* 191 Cal.App.4th at p. 1122.)

Defendant claims that, without his friend's "primer on weapon-use training, behavioral training, and trained response techniques," he was deprived of his constitutional right to defend himself. To the contrary, the Constitution gives " 'wide latitude' " to trial judges to exclude evidence that is " 'only marginally relevant' " or would pose an undue risk of harassment, prejudice or confusion. (*Crane v. Kentucky*, *supra,* 476 U.S. at pp. 689-690 [90 L.Ed.2d at pp. 644-645].) There was no abuse of discretion.

## II

Defendant next contends that in determining defendant's ability to pay the attorney fees, expert witness fees and probation investigation fees, the trial court impermissibly considered his public employee disability retirement pay.

After a defendant is provided a defense at public expense, a trial court may order the defendant to pay all or a portion of the cost of that defense, provided the trial court first determines after notice and hearing that the defendant has the ability to pay. (Pen. Code, § 987.8, subd. (b).) " 'Ability to pay' " means "overall capability" of the defendant to reimburse all or a portion of the defense costs based on his or her "reasonably discernible future financial position." (Pen. Code, § 987.8, subd. (g)(2).)

An order to pay defense fees and costs and the manner of reimbursement must fit the defendant's financial condition. (*People v. Smith* (2000) 81 Cal.App.4th 630, 642.) The findings supporting a trial court's order about a defendant's ability to pay may be express or they may be implied by the content and context of the hearing. (*People v. Phillips* (1994) 25 Cal.App.4th 62, 71.) We presume the trial court considered

12

appropriate factors in determining a defendant's ability to pay fines, fees and costs unless the defendant proves otherwise. (*Conservatorship of Rand* (1996) 49 Cal.App.4th 835, 841.) And we affirm a finding that a defendant has the ability to pay if it is supported by substantial evidence. (*Id.* at p. 842.)

Defendant testified that he had retired because of disability in 2007 after 11 years with the Burlingame Police Department. A defense witness testified that he had defendant's power of attorney to handle defendant's financial affairs, and that he followed directions from defendant about paying bills. The amount of the pension was not disclosed, but defendant owned and was driving a Mercedes Benz on the day of the shooting and a search warrant yielded $7,000 in cash at his apartment.

On the day the trial court sentenced defendant to prison, it reserved the question of his ability to pay restitution for another hearing, saying it "was clear that [defendant] was receiving a retirement benefit" and requesting details. The trial court went on to explain, "I heard testimony that he has an income. I intend to assess all or part of that because -- well, I know I can only touch half of it, but the good citizens of El Dorado County, the taxpayers, should not bear the burden of [paying for his defense] if the defendant has the financial means to pay for it . . . ." The trial court suggested that if defendant expected to shield the retirement assets, he should bring documentation to the hearing.

The trial court had little other information about defendant's finances, apparently because defendant refused to be interviewed for the probation officer's report. The probation report recommended that defendant be required to pay restitution and fees.

At the hearing to determine defendant's ability to pay, defendant offered a 1988 California Uniform Commercial Code (UCC) filing in which he named himself as both debtor and creditor and purported to indemnify and hold himself harmless from all claims by "juristic person[s]" as distinguished from "sentient, living being[s]." His lawyer said defendant described the document as a lien on "all assets," including his retirement. The

13

trial court told defendant he had seen similar documents and they did not shield assets.[2] Defense counsel also asserted that the disability retirement funds were shielded by Code of Civil Procedure section 704.110. As to the Code of Civil Procedure, defense counsel said he "ran out of time doing the research," but believed the disability benefits were exempt from attachment for civil judgments.

Orders to pay restitution and other fines are enforceable "in the manner provided for the enforcement of money judgments generally." (Pen. Code, § 1214, subd. (a).) With an exception for family support, public employment benefits are generally not subject to execution or assignment. (Govt. Code, § 22970.66.) The trial court acknowledged that the Code of Civil Procedure might shield retirement assets, but with defendant presenting no further defense or objection, it made a finding that defendant has the ability to pay restitution (including partial defense costs) out of his retirement and prison earnings. The trial court ordered the Department of Corrections and Rehabilitation to "w/hold monies from salary earned." The abstract of judgment includes an order for victim restitution but not for defense fees and costs.

Penal Code section 987.8 does not require an express determination of a defendant's ability to pay, but a finding of unusual circumstances is required before a prisoner may be ordered to make payments. (Pen. Code, § 987.8, subd. (g)(2)(B); *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1537.) The unusual circumstances requirement focuses on the prisoner's prospects for future income. (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1211, fn. 29.) The trial court here did not make explicit statements of unusual circumstances, but did note that defendant's was "an unusual situation" and "kind of new territory" and there was "at least indication and evidence of an ability to pay." The trial court said it knew from evidence presented at trial that

---

[2] The effectiveness of the UCC filing was not raised on appeal and we do not address it.

14

defendant was receiving retirement benefits and offered defendant an opportunity to explain why those benefits could not be considered in his ability to pay restitution.

Generally speaking, a trier of fact may draw adverse inferences from a party's failure to explain or deny evidence. (Evid. Code, § 413.) In the context of the ability to pay a punitive damage award, for instance, a defendant denied that he had any assets, but a trial court properly considered evidence of offshore bank accounts and an exempt private retirement plan. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 546-547.) The trial court in this case invited defendant to rebut the presumption that he has the ability to pay restitution; in response, defendant merely asserted that his disability retirement benefits are exempt from collection.

There is sufficient evidence to support a finding that defendant has the ability to pay. Defendant directed his friend to pay his other bills, so he presumably could direct him to pay his legal fees. If defendant's bills are unpaid and defendant has no resources other than his disability retirement benefits, defendant's creditors might face the enforcement limitations of Code of Civil Procedure section 704.110 and Government Code section 22970.66. (See Code Civ. Proc., § 704.110, subds. (b) and (c).) But the issue on appeal is ability to pay, not the ultimate enforceability of the judgment.

Defendant cites *Board of Retirement v. Superior Court* (2002) 101 Cal.App.4th 1062 for the proposition that ability to pay cannot be determined based on consideration of assets exempt from levy. But that case held only that a trial court could not direct a pension fund to deduct a restitution sum from a defendant's monthly disability allowance. (*Id*. at p. 1072.) Here, the trial court affirmatively stated that it would not issue such an order because that was the function of the California Victim Compensation and Government Claims Board and the prison authorities.

Defendant will not be eligible for parole for 50 years. The trial court assumed he would have prison earnings. When assessing ability to pay costs of defense, it is proper for a trial court to consider how alternative sources of income, such as a spouse's

earnings, reduce a defendant's need for income and create a greater ability to pay. (*People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1392.) Here, the trial court reasonably may have determined that defendant would have enough income from his disability pay that his prison earnings could be applied to the legal fees. Moreover, receipt of disability benefits alone constitutes sufficient evidence to support a finding that a defendant has the ability to pay costs of defense. (*Conservatorship of Rand*, *supra*, 49 Cal.App.4th at p. 842.) The trial court did not err in determining that defendant had the *ability* to pay. Issues may well arise if defendant has no other assets to attach or levy and he refuses to pay, but those issues are not presented in this appeal.

Defendant next argues he should not have been ordered to pay $350 for the preparation of a probation report because the evidence of his ability to pay was insufficient. He asserts once more that his ability to pay was based on his exempt disability retirement benefits, although the only finding on ability to pay for the probation report was in the probation report itself, which did not include any financial facts. In any event, defendant did not assert an objection to payment for the probation report in the trial court. Accordingly, the contention is forfeited. (See *People v. McCullough* (2013) 56 Cal.4th 589, 597-598 [sentencing determinations may not be challenged for the first time on appeal, including those based on a claim that there was insufficient evidence of a defendant's ability to pay].) Anticipating forfeiture, defendant asserts that he received ineffective assistance of counsel. But he has not established prejudice, because even if defendant had made a timely objection, the result would have been the same. The evidence was sufficient to support a finding of ability to pay for the reasons discussed *ante.* The claim of ineffective assistance lacks merit. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698].)

III

Defendant further contends the trial court improperly ordered him to pay restitution with the $7,000 in cash seized from his apartment, because there was no

evidence that he had any income other than disability retirement. He asks us to order the money returned to him or his authorized agent.

A trial court is required to "order full restitution unless it finds compelling and extraordinary reasons for not doing so and states them on the record." (Pen. Code, § 1202.4, subd. (f).) The trial court may order funds confiscated at the time of the defendant's arrest to be applied to the restitution order if the funds are not exempt for spousal or child support or "any other legal exemption." (*Ibid*.) Defendant offered no evidence regarding the source of the $7,000.

Defendant now argues it should have been apparent that the funds were exempt because, aside from retirement, defendant had "no other known source of income." He cites the tracing rules in Code of Civil Procedure section 703.080, but that statute clearly states that the "exemption claimant has the burden of tracing an exempt fund." (Code Civ. Proc., § 703.080, subd. (b).) The trial court was not required to speculate that the confiscated cash might have been traceable to an exempt source, nor are we. Even if retirement benefits were the initial source of the cash, the exemption may not have been effective. (See *Sourcecorp, Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061 ["Whether it be a fistful of dollars or $100,000 in a safe, once a debtor has had 30 days to pay for the necessities of life out of exempt earnings, the remainder becomes available to satisfy the debtor's outstanding obligation to a judgment creditor."].)

Acknowledging that defendant's trial counsel never asserted exemption in connection with the $7,000 in cash, he also asserts ineffective assistance of counsel "[t]o the extent an objection was required" to preserve the contention. We have not deemed the contention forfeited, focusing instead on whether defendant provided sufficient evidence regarding the source of the seized cash. We conclude he did not. Although defendant argues there is no evidence the cash did not come from his disability retirement, the burden is on him to prove that it did. On this record, it is possible

17

defendant obtained the $7,000 from a source other than his disability retirement benefits. Defendant has not established error.

IV

In addition, defendant contends a $10,000 " 'general fund' fine" was unauthorized. The Attorney General agrees the amount does not appear to be justified as a general fund fine. Although the trial court may have made a misstatement and then corrected itself, never intending to impose a $10,000 general fund fine, we will strike the $10,000 general fund fine to avoid any ambiguity.

The trial court first imposed a "20 percent surcharge," describing it as "20 percent of the base fine pursuant to [Penal Code] section 1465.7." Immediately afterward, it stated, "I will impose a $10,000 general fund fine; a $10,000 restitution fund fine; the surcharge in the amount of 20 percent pursuant to Penal Code Section 1465.7," and then it ordered other fines and fees. The minute order and abstract of judgment both record the $10,000 restitution fund fine but make no reference to a general fund fine. Nonetheless, it is the oral pronouncement of sentence that constitutes the judgment. (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)

Penal Code section 1465.7 requires a trial court to impose a state surcharge of 20 percent of the "base fine used to calculate the state penalty assessment." (Pen. Code, § 1465.7, subd. (a).) The full amount of the surcharge must be deposited in the state's general fund. (Pen. Code, § 1465.7, subd. (d).) The surcharge arguably could be called a "general fund fine" but the trial court imposed the surcharge separately and, in any event, the "base fine" excludes restitution fines. (Pen. Code, §§ 1202.4, subd. (e), 1464, subd. (a)(3).) Aside from restitution, the trial court imposed only a probation report fee of $350, a court security fee of $40 and a criminal conviction assessment of $30. If construed as a "general fund fine," a 20 percent surcharge on a "base fine" of $420 would have been $84, not $10,000. Using the same "base fine" calculation, a state penalty assessment of $420 was authorized by Penal Code section 1464 (calculated under

18

subdivision (a)(1) as a $10 assessment on every $10 of base fine) and that assessment is separate from, and in addition to, the state surcharge. (Pen. Code, § 1465.7, subd. (b).) But again, even if called a "general fund fine," that assessment would have been $420, not $10,000. The probation report recommended each of the fines actually imposed, but it made no mention of any "general fund fine."

Thus, it appears the trial court intended merely to correct the misspoken words "$10,000 general fund fine" and replace them with the words "$10,000 restitution fund fine." Nonetheless, to clear up any ambiguity in the oral pronouncement of judgment, we will strike the $10,000 general fund fine.

V

In reviewing the record we have also identified a clerical error on the abstract of judgment.[3] As we have explained, the trial court sentenced defendant to 25 years to life on the count I murder conviction and 25 years to life for one of the firearm enhancements. But item 6 of the abstract indicates that defendant was sentenced to 50 years to life on count I "PLUS enhancement time shown above[.]" Item 6 of the abstract of judgment must be corrected to reflect that defendant was sentenced to 25 years to life on count I.

DISPOSITION

The judgment is modified to strike the $10,000 general fund fine. The judgment is affirmed as modified. The trial court is directed to amend the abstract of judgment to reflect the judgment as modified, and to correct item 6 of the abstract of judgment to reflect that defendant was sentenced to 25 years to life on count I. The trial court shall

---

[3] The parties did not raise this issue in their briefs. Because the clerical error appears clear, however, we will order correction of the abstract without further briefing in the interest of judicial economy. Any party aggrieved may petition for rehearing. (Gov. Code, § 68081.)

19

forward a certified copy of the amended and corrected abstract of judgment to the

Department of Corrections and Rehabilitation.


                                              _____MAURO_____, Acting P. J.


We concur:


_____DUARTE_____, J.


_____HOCH_____, J.